**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Lawrence NORTON, Defendant– Appellant.**

**No. 96–2552.**

United States Court of Appeals, Seventh Circuit.

Submitted Jan. 31, 1997.[1]

Decided March 3, 1997.

1. This case was scheduled to be orally argued on December 9, 1996. It did not proceed to argument, however, because we granted a motion for a continuance filed by the appellant. Subsequently, after an examination of the briefs and the record, the court has concluded that oral argument is unnecessary; accordingly, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a); Cir. R. 34(f).

Barry Rand Elden, Chief of Appeals (submitted), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff-Appellee.

Ralph E. Brown, Michael F. Braun, Schuyler, Roche & Zwirner, Chicago, IL, for Defendant-Appellant.

Before COFFEY, MANION, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In a traditional check kiting scheme, a person artificially inflates a checking account balance during the "float" time that passes when a check moves between two or more banks. Check kiting (assuming the victim is a federally insured financial institution) violates the federal bank fraud statute, 18 U.S.C. § 1344. But can one violate the statute when only one account at one bank is used in the scheme? The answer is "yes."

All Lawrence Norton wanted for Christmas in 1993 was a larger checking account balance. So, on December 23, although he didn't have much money in his account at LaSalle National Bank, Norton, a certified public accountant, wrote himself a check for $19,800. Norton then deposited the check back into his LaSalle account through a second bank's ATM. Norton was no dummy—he realized that by using a non-LaSalle ATM his "deposits" would be credited to his account within 24 hours, but the check wouldn't be presented to LaSalle for payment until a few days later. As a result, his account would reflect an artificially high balance during the intervening "float" period. In order to use the float to obtain cash advances and write checks to third parties, however, Norton had to keep his "kite" in the air. That is, he needed to repeat his original transaction over and over again to avoid detection and prolong his use of the inflated balance. That's exactly what he did, writing 79 checks (totaling over $1.3 million) to himself by March 29, 1995. During that time Norton wrote checks to third parties and withdrew cash by using ATM's when he knew his account truly had no legitimate funds available to honor the checks and withdrawals.

On April 5, 1994, sirens went off as the high volume of activity on the account landed Norton's name on a "suspect kiting report" generated by LaSalle. After LaSalle's audit manager reviewed the report, the bank called Norton and asked him to explain his behavior. Norton agreed there "appeared to be a problem," but offered no real explanation for his activities.

Subsequently, a grand jury indicted Norton for bank fraud under 18 U.S.C. § 1344. Norton moved to dismiss the indictment, arguing that his behavior did not constitute a "scheme to defraud" under the law. Norton attempted to distinguish his activities from an illegal check kiting scheme, which usually involves writing checks back and forth between accounts at different banks. Norton contended that without a second bank, the first would know the customer's account is overdrawn and would not be tricked into honoring a worthless check. According to Norton, when a bank honors a series of worthless checks from a single account, it is simply extending an overdraft loan. So, Norton was saying, this was a mere civil matter covered by the Uniform Commercial Code; it was nothing to get the feds nipping at his heels.

Norton was unable to cash in on his argument in the district court. The district judge reasoned that Norton's goal was no different from that of a typical check kiter—to trick a bank into thinking he had a higher balance. As a result, the judge found that the indictment properly alleged a violation of § 1344(1) and set the case for trial.

At trial, Norton did not mount much of a defense. He merely opted to cross-examine

LaSalle officials about the bank's procedures for honoring overdrafts, approving loans, and extending credit. At closing, Norton argued that LaSalle knew his account was overdrawn and had extended him a loan to cover his overdrafts. The jury didn't buy the argument and found him guilty. Norton then moved for a judgment of acquittal under Rule 29(c). That motion was denied, and Norton eventually was sentenced to a month in prison, 5 months of in-home detention, and 4 years of supervised release. We now consider his appeal.

Norton first challenges the sufficiency of the indictment. Section 1344(1) makes it a felony to knowingly execute a scheme to defraud a financial institution. "Whether a scheme to defraud exists is determined by examining 'whether the scheme demonstrated a departure from fundamental honesty, moral uprightness or fair play and candid dealings in the general life of the community.'" *United States v. Hammen*, 977 F.2d 379, 383 (7th Cir.1992) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987)). One such scheme is check kiting. *United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994).

Norton argues, as we said earlier, that check kiting necessarily involves accounts at two different banks. He contends that when only one bank is involved, the decision to honor a check merely constitutes an overdraft loan. In this case, Norton claims that LaSalle "was on notice" that his account was overdrawn.

Judge Bucklo in the district court disagreed and held that the indictment sufficiently alleged that Norton intended to defraud the bank. In response to Norton's loan argument, Judge Bucklo pointed out that the indictment alleged Norton's scheme *prevented* the bank from discovering the account was overdrawn. It followed, then, that the bank did not choose to extend overdraft protection.

Judge Bucklo's opinion hits the nail on the head. While a "traditional" check kiting scheme may involve multiple banks, *see LeDonne*, 21 F.3d at 1425 n. 2, § 1344(1) does not simply ban traditional check kiting. In-

stead, the statute prohibits any "recognizable scheme formed with the intent to defraud." *Id.* at 1425. The broad range of schemes covered by the statute is limited only by a criminal's creativity. In this case, we think the indictment sufficiently alleged that Norton designed a scheme—a version of check kiting where an ATM fills the shoes of a second bank—to "separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against . . . insufficient funds." *United States v. Doherty*, 969 F.2d 425, 428 (7th Cir.), *cert. denied*, 506 U.S. 1002, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992).

Norton next argues that the district court should have set aside the verdict and entered a judgment of acquittal. We will only disturb a jury verdict, however, "when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Theodosopoulos*, 48 F.3d 1438, 1444 (7th Cir.) (quotations omitted), *cert. denied sub nom.*, — U.S. —, 116 S.Ct. 191, 133 L.Ed.2d 128 (1995). This argument, like Norton's opener, goes nowhere.

The jury here was free to accept or reject Norton's loan defense, and the verdict which rejected it is clearly supported by the evidence. First, LaSalle's records show that between December 23, 1993, and April 1994 Norton's account ranged from a falsely inflated low of $10,791 to a falsely inflated high of $62,621. The jury could certainly have inferred from these records that Norton's actions prevented LaSalle from discovering the account's actual balance. Second, the trial testimony made clear that even though a LaSalle-owned ATM was located less than a block from his office, Norton always deposited his checks at a non-LaSalle ATM which was further away. The jury also heard evidence that a non-LaSalle ATM was needed to carry out the scam (otherwise the checks would reach LaSalle too quickly). Given these facts, the jury could have reasonably concluded that Norton's decision to use a non-LaSalle ATM signaled his intent to defraud LaSalle. Finally, if Norton really thought LaSalle was extending him an over-

draft loan, why didn't he stop after the first "loan" in December 1993? The jury was obviously entitled to conclude that Norton's 79 transactions revealed his intent to trick LaSalle into honoring his worthless checks. The judgment below is, therefore, AFFIRMED.