**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Susanne YOON, also known as Soon Yoon, Defendant–Appellant.**

No. 96–2943.

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1997.

Decided Oct. 15, 1997.

David E. Bindi (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Susan Bogart (argued), Chicago, IL, for Defendant–Appellant.

Before BAUER, CUDAHY, and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

This case involves the Yoons' high-flying check-kiting scheme. The scheme was of staggering proportion; 697 checks, amounting to over $20 million dollars, were kited over a ten-month period. In connection with that scheme, Susanne Yoon and her husband David were charged in a one-count indictment with committing bank fraud by means of a check kite, in violation of 18 U.S.C. § 1344(1). After a bench trial, the district court found Mrs. Yoon guilty and sentenced her to twenty-four months, to be followed by three years of supervised release. On appeal, Mrs. Yoon argues (1) that the district court erred in refusing to dismiss the third superseding indictment; (2) that the evidence against her was insufficient to establish a guilty finding; (3) that the government's *Santiago* proffer was insufficient; (4) that the district court erred in permitting the expert testimony of FBI Special Agent Wolverton; (5) that the district court erred in admitting the testimony of Susan Heller; and (6) that the district court erred in its application of the Sentencing Guidelines. We affirm.

## Background

Susanne Yoon and her husband David owned and operated two businesses in Lin-

colnwood, Illinois. Davidcraft Corporation was an import company that imported various items for resale, and International Connections Incorporated ("ICI") was a mail order business. Both businesses were run out of an office in a one-story building and warehouse at 7040 North Lawndale Avenue. David Yoon was president of both companies and was in charge of sales and client contacts. Mrs. Yoon was vice-president and secretary, in charge of accounting and office management. Two of the Yoons' employees, Maureen Rasho and Susan Heller, testified at trial. Rasho was a full-time employee. She was hired as an assistant bookkeeper in 1986 and was the bookkeeper during the period charged in the indictment. Heller was a part-time employee, and worked two to three days per week performing accounting duties, reconciling bank accounts, and paying Davidcraft's bills.

Five checking accounts were involved in the check-kiting scheme. The Yoons had joint signatory authority over all five accounts. The Yoons had two personal checking accounts, one with the Affiliated Bank and one with Itasca Bank. The Yoons had a business checking account for Davidcraft with Affiliated Bank and a business checking account for ICI with Foster Bank. The Yoons also had a business checking account for Davidcraft at the Commercial Bank of Korea.[1] In addition to the checking accounts, the Yoons also had several loans at the Affiliated Bank in both their names. They had one $200,000 revolving loan for the business and one $100,000 revolving loan for the business, both secured by the business' accounts receivables. They also had a $240,000 mortgage on the business property and a $140,000 residential mortgage on a home in Glenview.

Susan Heller and Maureen Rasho both testified that each morning, Rasho was responsible for calling all of the banks where the Yoons had accounts to obtain balance information. She would write the balance information on a piece of paper and give the paper to one of the Yoons. The Yoons would sometimes confer with each other, after which one of them would instruct Rasho or Heller as to what checks to write for deposit, in what amounts, and into which Yoon accounts. Rasho and Heller, and sometimes Mrs. Yoon, would then prepare the checks for signature. Heller testified that Mrs. Yoon sometimes gave her the instructions to call the banks to get the account balances, in particular, when David Yoon was away on business. Both Rasho and Heller testified that when they were done with the bank reconciliations at the end of the month, they would put them in Mrs. Yoon's office for review. Rasho testified that Mrs. Yoon trained her in her accounting duties and was her supervisor. Rasho also testified that the Yoons discussed and made business decisions together.

In 1983, David Yoon hired John Zalud, a CPA, to be the accountant for Davidcraft, and later, to a limited extent, for ICI. Zalud also testified at trial. In 1983, Zalud did a certified audit of Davidcraft, and from 1983 through 1989, Zalud did compilations for the company as well as financial statements, quarterly tax returns, and corporate and personal tax returns for the Yoons. He reviewed the company's cash receipts and disbursement journals, sales and payroll journals, bank statements, and reconciliations. He visited the Yoons' office at least once per quarter, and he testified that when he did so, he usually set up the appointment with Mrs. Yoon. He testified that Mrs. Yoon was the office manager and that he would ask her if he had particular questions or problems. Heller also testified that Zalud worked with Mrs. Yoon when he came to the office.

Zalud testified that from 1983 to 1986, Davidcraft had gross sales averaging $11 million and an average yearly profit of $500,000. In 1987, sales dropped to $9 million, and in 1988, to $7.8 million, with a profit of approximately $200,000. Zalud testified that the Yoons' salaries were also dropping; combined, they had totaled about $500,000 in 1986 and 1987, and in 1988, they totaled about $75,000 (a serious adjustment indeed). In 1989, Davidcraft's gross sales were $4.2

---

1. The Commercial Bank of Korea is not a federally insured financial institution for purposes of

18 U.S.C. § 1344.

million with expenses of $4.8 million, putting the Yoons' business $600,000 in the red. Oddly, despite the serious decrease in their combined income and the decline in sales, in 1989 the Yoons contributed $200,000 to their church, and in the fall of 1989 the Yoons bought a $1.4 million dollar home in Winnetka with monthly mortgage payments of approximately $10,500.

From January 2, 1990 to October 17, 1990, the period charged in the indictment, the Yoons' checking accounts were highly active, to state the case mildly. In April of 1990, Zalud became concerned with the status of the business and with what he observed in Davidcraft's cash disbursement journals. It seemed to him that there were numerous company checks being written to both Yoons in increasing amounts and with increasing frequency, and numerous company checks being cross-deposited into other Yoon accounts. In April of 1990, he talked with the Yoons in their office, and expressed concern about the decline in sales and the cross-depositing of company checks. David Yoon responded that he hoped the business would pick up, but he did not respond to Zalud's comments about the cross-deposits. Zalud testified that cross-depositing was not an unusual practice for the business, but the increased number of deposits and the increased amounts caused him to raise the issue with the Yoons. After that conversation, Zalud did not receive any more bank reconciliations for 1990, and he was told that the books were not yet ready for his review. Zalud began to decrease the amount of work he did for the Yoons at that point because they owed him money.

At trial, FBI Special Agent Randal Wolverton testified as an expert in check-kiting. He examined a series of check transactions using a chart with a step-by-step analysis, to illustrate a series of cross-deposits between the Affiliated Bank Davidcraft account, the Affiliated Bank personal account, the Foster Bank ICI account, and the Itasca Bank personal account. These cross-deposits were made over a two-day period. Agent Wolverton described how the time in the "float" made it look like the balances in the accounts were positive when they were actually nega-

tive. This phenomenon occurred, according to Agent Wolverton's testimony, because deposited funds posted to an account are available immediately even though it may take at least a day for the check to be honored by the bank on which it is drawn.

Agent Wolverton testified that from the period of July 19, 1990 to October 31, 1990, the total amount of deposits to all five checking accounts was $16,811,662.61. Of this amount, only $701,186.14 came from outside sources, and the remaining $16,110,436.47 came from checks drawn on other Yoon accounts. That is, 95.7% of the deposits made during that time came from cross-deposits among the Yoons' accounts. Agent Wolverton concluded that, in his opinion, check-kiting occurred in this case and put the banking system at a risk of loss.

FBI Special Agent Deborah Jones also testified at trial. She had performed a computer analysis of the Yoons' bank records from January 1989 through October 1990. She testified that all five Yoon accounts had combined total deposits of $2,432,577 for the calendar year 1989. In the first ten months of 1990, all five Yoon accounts had combined total deposits of $24,771,077, a more than $20 million increase from 1989. In the first ten months of 1990, $4,032,305.99 was deposited into the five Yoon accounts from outside sources. In that period, $4,678,368.33 in checks were written from all five Yoon accounts to third parties. The total amount of cross-deposited checks into all five Yoon accounts for that period was $20,385,713.45. She concluded that 697 kited deposits were made during the indictment period. Mrs. Yoon signed 389 of these checks, for a total of $10,785,518.86. David Yoon signed 308 of the kited checks, for a total of $9,376,543.79.

In October 1990, the Affiliated Bank personal account had a balance of $50.78. All other Yoon accounts, however, were overdrawn. The Affiliated Bank Davidcraft account was overdrawn by $38,399.82; the Itasca Bank personal account was overdrawn by $67,848.80; the Foster Bank ICI account was overdrawn by $360,714.33. During the ten-month period, the banks had honored a total of 38 overdrawn checks by the Yoons. An official from the Itasca Bank testified that his review of the Yoons' records led him to suspect check-kiting.

On July 6, 1995, the grand jury returned a one-count indictment against both David and Susanne Yoon based on this alleged check-kiting scheme. The third superseding indictment charged that, between January 2, 1990 and October 17, 1990, Mrs. Yoon and her husband knowingly and intentionally defrauded Foster Bank, Itasca Bank and Affiliated Bank by means of a check kite, in violation of 18 U.S.C. § 1344(1). David Yoon never appeared to answer the charge and remains a fugitive from justice. His case was severed from Susanne Yoon's. On January 25, 1996, Mrs. Yoon waived trial by jury and opted to be tried by the district court.

At trial, the government introduced the evidence recounted above, along with other evidence. Mrs. Yoon did not produce any witnesses in her defense. On April 2, 1996, after denying Mrs. Yoon's Rule 29 motion for judgment of acquittal, the court entered a finding of guilty. The court found that the government had established the check kite beyond a reasonable doubt, as well as Mrs. Yoon's knowing participation in the scheme to defraud and her intent to defraud the banks. No new evidence was presented at the June 10, 1996 sentencing hearing, but the parties did contest several issues relating to the application of the Sentencing Guidelines. The district court then sentenced Mrs. Yoon to twenty-four months imprisonment, to be followed by three years of supervised release. The district court also ordered Mrs. Yoon to perform 300 hours of community service, to pay restitution to the Foster Bank in the amount of $7,500, and not to open any new lines of credit without receiving approval from the probation office. Mrs. Yoon filed a notice of appeal on August 5, 1996.

### Analysis

I. *Sufficiency of the Indictment and of the Evidence*

Yoon's arguments on appeal as to the sufficiency of the indictment and the sufficiency of the evidence blend together, centering on two main contentions. First, she contends that the government never alleged or proved beyond a reasonable doubt that she acted with the requisite intent, knowledge of, and involvement in this check-kiting scheme. Second, she contends that the government never alleged or proved beyond a reasonable doubt that, for purposes of 18 U.S.C. § 1344(1), a scheme to defraud a financial institution existed or that the banks were actually defrauded. Her arguments overlap, so we address them together.

■ Before trial, Mrs. Yoon moved to dismiss the indictment.[2] She argued that it failed to allege that she defrauded the financial institutions. The district court denied the motion, finding that the indictment sufficiently alleged that both Yoons committed bank fraud by means of a check-kiting scheme, in violation of 18 U.S.C. § 1344(1). *United States v. Yoon*, No. 95 CR 400–2 (N.D.Ill. Jan. 24, 1996). In support, the district court cited *United States v. LeDonne*, 21 F.3d 1418, 1425–28 (7th Cir.), *cert. denied*, 513 U.S. 1020, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994). Mrs. Yoon now argues on appeal that the third superseding indictment was insufficient as a matter of law and that the district court should have dismissed it. She believes that the indictment fails to allege specific acts that she committed which constituted knowing participation in the scheme to defraud, and it fails to allege an illegal purpose of the scheme as required by § 1344(1).

■ We review a challenge to the sufficiency of an indictment *de novo*. *Frank v. United States*, 914 F.2d 828, 830 (7th Cir. 1990). An indictment will be deemed sufficient if it (1) states the elements of the offense charged, (2) fairly informs the defendant of the nature of the charge so that she may prepare a defense, and (3) enables her

---

2. The motion actually addressed the first superseding indictment, but Mrs. Yoon adopted the motion with respect to the second superseding indictment. The district court's denial referred to the second superseding indictment. The government's brief in this Court alleges that none of the changes made in the indictments affect the substance of Yoon's motion, and Yoon herself has not drawn any distinctions between the indictments; in fact, she argues that she moved to dismiss the third superseding indictment. On appeal, we are reviewing the third superseding indictment.

to plead an acquittal or conviction as a bar against future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Allender*, 62 F.3d 909, 914 (7th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996). "In reviewing the sufficiency of an indictment, a court should consider the challenged count as a whole and should refrain from reading it in a hypertechnical manner." *United States v. McNeese*, 901 F.2d 585, 602 (7th Cir.1990) (citations omitted). It is generally sufficient that an indictment set forth the offense in the words of the statute itself if the statutory language unambiguously sets out all the elements necessary to constitute the offense. *United States v. Hinkle*, 637 F.2d 1154, 1157 (7th Cir.1981) (citing *Hamling*, 418 U.S. at 117, 94 S.Ct. at 2907).

█ The bank fraud statute, 18 U.S.C. § 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. In this case, the Yoons were indicted under § 1344(1). Section 1344(1) prohibits any "recognizable scheme formed with the intent to defraud." *Le-Donne*, 21 F.3d at 1425. Although bare check-kiting is not an offense under § 1344(2), see *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), we have clearly held that a bare check-kiting scheme *is* an offense under § 1344(1). *United States v. Doherty*, 969 F.2d 425, 428 (7th Cir.), *cert. denied*, 506 U.S. 1002, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992) ("Check kiting, at root, is a plan designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds."). In essence, a check kite allows the schemers to trick the banks into giving them interest-free loans. *See Williams*, 458 U.S. at 281 n. 1, 102 S.Ct. at 3089 (describing check-kiting schemes); *Le-Donne*, 21 F.3d at 1425 n. 2 (same).

█ To sustain a conviction for bank fraud under § 1344(1) based on a check kite, the government must prove beyond a reasonable doubt that the defendant knowingly executed a scheme to defraud a financial institution. *United States v. Norton*, 108 F.3d 133, 135 (7th Cir.1997); *LeDonne*, 21 F.3d at 1427–28. That is, the indictment here must allege (1) that *Mrs. Yoon* (2) *knowingly* (3) engaged in a *scheme to defraud* the banks. We are certain that the detailed, seventeen-page indictment here properly alleges all three of these elements.

█ First, the scheme to defraud. We have broadly interpreted the range of schemes covered by the statute as being "limited only by a criminal's creativity." *Norton*, 108 F.3d at 135. For purposes of § 1344(1), "scheme[s] to defraud ... [are] broadly conceived to include conduct designed to deceive in order to obtain something of value, which ... may or may not include conduct involving false statements or misrepresentations of fact." *LeDonne*, 21 F.3d at 1426 (citations and emphasis omitted). The indictment here clearly alleges that, from January 2, 1990 to October 17, 1990, David and Susanne Yoon "knowingly executed and attempted to execute a scheme to defraud Foster Bank, Itasca Bank, and Affiliated Bank ("the banks"), which scheme and artifice to defraud is commonly known as a 'check kite,' by creating fictitious balances in their checking accounts...." The indictment goes on to thoroughly describe how the Yoons wrote 697 checks on the five accounts involved, and arranged for the checks to be deposited

in such a manner and at such times so as to artificially and fraudulently inflate the numerical balances in their checking accounts.... This was done by the defendants to manipulate the numerical balance in the checking accounts and thereby create the false and fraudulent appearance that defendants' [sic] had sufficient legiti-

mate available funds in various checking accounts, and to trick the banks into honoring checks drawn against accounts with insufficient funds.

The indictment continues for thirteen more pages describing the scheme to defraud in detail. For example, it describes how, in early 1990, the Yoons had a positive balance in all five checking accounts totaling approximately $8,305. During the ten-month period charged in the indictment, the indictment alleges that the Yoons deposited or caused to be deposited approximately $24,418,019 into the five accounts, of which $20,162,062 came from 697 nonsufficient fund, "kited" checks. The indictment also gives a detailed example of a five-step process by which, on August 2 and 3, 1990, the Yoons cross-deposited five interrelated checks totaling $158,000 in order to fraudulently inflate the balances of two of their accounts. This is, contrary to Mrs. Yoon's argument, an allegation of a scheme to defraud for purposes of § 1344(1), not § 1344(2). The indictment continues, but we need not. It more than sufficiently alleges a scheme to defraud the banks.

■ Next, we are sure that the indictment sufficiently alleges Mrs. Yoon's knowledge of and involvement in the scheme. It alleges that she maintained all five accounts jointly with her husband; that she personally signed 389 of the 697 kited checks, for a total of $10,785,518; that she was the office manager of the two Yoon businesses; that both she and her husband had employees contact the banks to obtain account balances; that she conferred with her husband after receiving the balances; that both of them would give written and oral instructions to their employees as to the shifting of funds among the accounts; that both of them would give written and oral instructions to their employees to prepare the kited checks; and that she personally typed out and prepared a number of the 697 kited checks. In sum, there are more than sufficient allegations in the indictment that Mrs. Yoon knowingly and intentionally participated to a substantial degree in this check-kiting scheme to defraud.

■ We find it difficult to distinguish between Mrs. Yoon's arguments as to the sufficiency of the indictment and the sufficiency of the evidence. The government is correct that the indictment is not the vehicle by which it was required to prove Mrs. Yoon's state of mind beyond a reasonable doubt. The indictment only must sufficiently allege the elements of the § 1344(1) offense, one of which is that Mrs. Yoon acted with *knowledge* of the scheme to defraud. Having concluded that the indictment does indeed sufficiently allege all the elements of the offense, we move on to the sufficiency of the evidence argument. In addition to the indictment sufficiently alleging all three of the required elements under § 1344(1), we are convinced that the evidence adduced at trial was more than sufficient to prove all three of these elements beyond any reasonable doubt.

■ We review the evidence and draw all reasonable inferences that can be drawn from it in the light most favorable to the government. We will affirm if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *United States v. Katalinich*, 113 F.3d 1475, 1480 (7th Cir.1997). As we indicated above in discussing the sufficiency of the indictment, to sustain a conviction for bank fraud under § 1344(1) based on a check kite, the government must prove beyond a reasonable doubt that the defendant knowingly executed a scheme to defraud a financial institution. *Norton*, 108 F.3d at 135; *LeDonne*, 21 F.3d at 1427–28.[3]

Mrs. Yoon's first argument, which we referred to above, is that the evidence did not show that she had the requisite intent to defraud. This is tied to the second argument—that there was not really a scheme to defraud, but, merely, overactive checking accounts and a lot of cross-depositing, which is not necessarily an illegal check-kiting scheme. Both of these arguments, however, fly in the face of the overwhelming evidence against Mrs. Yoon. As we said in *LeDonne*, "[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established

---

**3.** The parties stipulated that the banks named in the indictment, except the Commercial Bank of

Korea, were federally insured financial institutions, so that element is not in issue here.

by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." 21 F.3d at 1426. As such, *LeDonne* indicated that the execution of the scheme, in itself, may be relevant to establishing the defendant's specific intent to defraud. *Id.*

This is such a case. This was, as the district court said, "a very large project in deception." While it is true that there is no evidence that Mrs. Yoon said, "I intend to defraud these banks," the sheer numbers of checks and amounts of money involved in this scheme during the ten-month period provide a surrogate for Mrs. Yoon's knowledge. As the district court stated, there was "a virtual tornado of checks circulating between the five bank [accounts]." However, we hardly have to rely just on the existence of the scheme to defraud—there was more than sufficient testimonial evidence linking Mrs. Yoon to the scheme and providing evidence of her knowing participation in it. The evidence established that in 1989, the Yoons' businesses were operating at a loss of $600,-000, and that the Yoons took a salary decrease of approximately $425,000. The accountant, John Zalud, testified that he had a discussion with Mrs. Yoon and her husband about their decline in salary, as well as about the business finances and his concern over the number and amount of cross-deposited checks. He also testified that he went over the books and records quarterly, and consulted Mrs. Yoon in relation to his reviews.

The testimony of Maureen Rasho and Susan Heller also provided compelling evidence of Mrs. Yoon's knowledge of and involvement in the scheme. Rasho and Heller both testified that they would call the banks to get the account balances. David, and sometimes Mrs. Yoon, would then instruct them as to how to move the money between the accounts. Heller testified that, many times, Mrs. Yoon and her husband would confer about the balances before instructing Rasho and Heller as to what transfers to make. Moreover, testimony of Zalud and Heller together established that, after Zalud stopped doing the bank reconciliations in 1990, Mrs.

Yoon did them herself. Both Rasho and Heller testified that Mrs. Yoon was in charge of accounting and kept track of all the bank statements, books, and records for the businesses. In addition, the government introduced an August 3, 1990 note that illustrated a series of five cross-deposits designed to float the kite. The note was written by David Yoon to Maureen Rasho, but Mrs. Yoon's handwriting appeared on it; she wrote the check numbers of the deposit items making up the transactions. This is substantial testimonial evidence implicating Mrs. Yoon's knowledge of the businesses' financial situation.

As the government points out, because Mrs. Yoon had detailed knowledge of the financial situation of the business, she also knew the following: that business was in decline; that the business was operating on a deficit (deposits to all five accounts from outside sources was $4 million while the total number of checks written was $4.6 million); and that during the ten-month period, $24,-771,077 was deposited to all five accounts, of which $20,385,713.45 came from cross-deposited checks. Mrs. Yoon herself signed over $10 million dollars worth of kited checks. As the government points out, "[t]here is no conceivable legitimate business purpose for writing 697 cross-deposited checks totaling over $20 million when the business took in only $4 million in revenue from outside sources. Rather, it was done because expenses exceeded revenue by $600,000, and defendant and her husband were attempting to conceal the shortfall and remain in operation by running a check kite." From this evidence, the district court could reasonably infer that Mrs. Yoon had intricate knowledge of the scheme during the ten-month period.

Finally, Mrs. Yoon points out that after the fraud was discovered, she and her husband made full restitution to two of the banks and signed a note and pledged collateral to secure their debt to the third bank. She argues, citing *United States v. Sirang,* 70 F.3d 588 (11th Cir.1995), that this proves her good faith and negates any inference of her intent to defraud. *Sirang* is inapposite because it involved a defendant whose defense was that he wrote checks in good faith,

not that he returned the money in good faith. Mrs. Yoon's conduct after the fraud was completed is irrelevant to the issue of whether the evidence was sufficient to show that she knowingly participated in the fraud during its existence, and we do not consider it for such a purpose.

■ Mrs. Yoon's second major contention about the sufficiency of the evidence is that there was not, in actuality, a scheme to defraud. She focuses on the fact that, because the banks' officers testified that they knew the Yoons were bouncing checks, the banks were alerted to this conduct and were not actually defrauded. First of all, we have already put to rest the idea that someone need actually be deceived for the § 1344(1) offense to be complete. *LeDonne*, 21 F.3d at 1426 ("it matters not … whether the fraud succeeded and the victim [was] deceived"). That is of no matter, though, because it is clear that the evidence was sufficient to establish that there was a scheme to defraud the banks for purposes of § 1344(1). As the district court described when it announced judgment, this scheme worked because of the existence of the five different accounts and four banks. The banks could not see what was going on with each of the other four accounts—that was how the kite was able to fly. Thus, the argument that each individual bank knew that nonsufficient fund checks were being written is irrelevant because the banks had no idea what was going on with the other accounts. As the district court stated, "[t]he fact that there [were] 38 overdrafts, or whatever the final number was, out of 697 kited checks I think shows a remarkable attention to detail by both David Yoon and the defendant that there were only 38 slips between the cup and the lip where they had to come in and make 'good.' And I use that in quotes because they made good with kited checks in most, if not all, of the instances." We agree.

In conclusion, we concur with the district court's assessment of the evidence in this case. It stated: "This may well be a case where the evidence is so overwhelming that it is almost difficult to address the elements, but I think we have evidence-we have addressed those elements, particularly of her

knowledge of the artifice and scheme to defraud deceiving the banks thus subjecting them to risk." The government proved beyond a reasonable doubt that the kite got off the ground with help from Mrs. Yoon. Mrs. Yoon's arguments, unfortunately, do not fare so well. We are certain that the district court was correct in finding Mrs. Yoon guilty based on the evidence presented.

## II. The Santiago Proffer

■ Prior to trial, Mrs. Yoon filed a motion in limine asking the district court to require the government to make a proffer pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978) if the government intended to use David Yoon's conduct against Mrs. Yoon at trial. The government filed its *Santiago* proffer on January 25, 1996, detailing what the evidence at trial would show. This included the proposed testimony of Rasho, Heller, and Zalud, which we have already outlined above, regarding Mrs. Yoon's participation in the scheme and her knowledge of the office finances. Attached to the proffer was the August 3, 1990 note with Mrs. Yoon's handwriting.

On the first day of trial, March 25, 1996, the district court orally ruled that the *Santiago* proffer was sufficient to establish a conspiracy and Mrs. Yoon's part in it, such that David Yoon's conduct and statements could be admitted against her as co-conspirator statements. *See* FED.R.EVID. 801(d)(2)(E). Mrs. Yoon now argues that the district court erred in admitting this evidence against her because the proffer and the evidence adduced at trial did not sufficiently establish independent evidence of her agreement to join the scheme. Further, because David Yoon is a fugitive from justice and unavailable for cross-examination, she contends that the use of his conduct and statements against her violated her rights under the Confrontation Clause of the Sixth Amendment.

■ We review the district court's decision to allow evidence pursuant to Rule 801(d)(2)(E) for clear error. *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir.1997); *United States v. Rodriguez*, 975 F.2d 404, 408–11 (7th Cir.1992) (stating that we review district court findings under Rule

801(d)(2)(E) based on pre-trial *Santiago* proffers for clear error). Using this standard, we will reverse the district court's ruling only if we are left with the definite and firm conviction that the court made a mistake. Under *Santiago* and its progeny, in order to allow the admission of coconspirator statements, the government must show, by a preponderance of the evidence, that a conspiracy existed, that the defendant and the declarant were members of that conspiracy, and that the statements sought to be admitted were made during and in furtherance of that conspiracy. *Santiago*, 582 F.2d at 1134; *Rodriguez*, 975 F.2d at 406.

This *Santiago* argument is not unlike Mrs. Yoon's sufficiency of the evidence argument. Most of the arguments made here actually boil down to the same sufficiency issues. *See, e.g., United States v. Velasquez*, 67 F.3d 650, 654 (7th Cir.1995). We have already dispensed with Mrs. Yoon's contentions that the evidence did not sufficiently establish that she was a member of this check-kiting scheme. Similarly, we have reviewed the *Santiago* proffer and have no doubt that it was more than sufficient to establish the admissibility of David Yoon's conduct and statements against Mrs. Yoon. The proffer explicitly set forth how the government would prove the existence of the check-kiting scheme, that *both* Yoons knowingly participated in it, and that David Yoon's conduct was undertaken during and in furtherance of it. The proffer relied on much more than mere statements by Mrs. Yoon or by her co-conspirator husband, but, rather, relied on testimony that would be provided by independent witnesses who were not participants in the scheme. The proffer met the preponderance of the evidence test, and we are certain that the district court did not err in admitting the evidence.

### III. Agent Wolverton's Testimony

▮ Next, Yoon argues that the district court committed reversible error in allowing Agent Wolverton to testify as an expert in check-kiting. At trial, defense counsel objected to Agent Wolverton's testimony on the grounds that the government failed to comply with the disclosure requirements under Rule 16. *See* FED. R.CRIM. PRO. 16(a)(1)(E). Rule 16(a)(1)(E) requires the government to provide a written summary of any expert witness testimony including: (1) the witness' opinions; (2) the bases and reasons for the opinions; and (3) the expert's qualifications. *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir.1995). We review a district court's ruling on a Rule 16 disclosure for abuse of discretion. *Id.* Counsel essentially argued that the government had not supplied Mrs. Yoon with information as to the expert's opinions and the bases and reasons for them prior to trial. The district court ruled that he would admit the testimony, and that the defense could cross-examine the expert as to the grounds for objection. On appeal, Yoon continues to object that the Rule 16 disclosure did not explain how Agent Wolverton's testimony would relate to Mrs. Yoon's alleged involvement in the check-kiting scheme.

In response to Mrs. Yoon's request for disclosure, the government provided two letters, dated January 17, 1996 and March 18, 1996. These letters set forth Agent Wolverton's qualifications and experience in the area of suspected check-kiting. The government also gave defense counsel copies of all the checks and summary charts the government would use in connection with Agent Wolverton's testimony. Moreover, the government tendered to the defense copies of a transcript from an unrelated trial in which Agent Wolverton had previously testified as to the methodology and the bases he uses for analyzing check-kiting. We have reviewed the two letters and the trial transcript from Agent Wolverton's earlier testimony. The government more than fulfilled its obligation to disclose information about its expert to the defense. The two letters informed the defense that Agent Wolverton would testify consistently with the checks, charts, and graphs. Most important, in the January 17, 1996 letter, the government told defense counsel exactly what Agent Wolverton's opinion in this case would be—that "a check kite occurred in the present case when the defendant and her husband caused checks to be drawn on various bank accounts that did not have sufficient funds and then deposited

them into other accounts, thereby artificially inflating the account balance, resulting in the banks honoring checks based on non-sufficient and artificial funds." The March 18, 1996 letter stated that the information was being provided in accordance with Rule 16(a)(1)(E) and with Rules 701–703 and 705 of the Federal Rules of Evidence. That letter specifically went through the disclosure and showed how it complied with each of these rules. That letter also described Agent Wolverton's expert qualifications and credentials and itemized the courses he had taken related to analyzing financial transactions. The government's attorney stated to the court, "I don't know what more I can give to [defense counsel] short of giving her his direct examination and his anticipated answers." We agree.

Defense counsel also objected at trial that Agent Wolverton's testimony could not comply with the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because his methodology could not be authenticated under Rule 104(a). In *Daubert*, the Supreme Court established that when a trial judge is faced with a Rule 104(a) proffer of expert scientific testimony, he must determine whether the expert will testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Id.* at 592, 113 S.Ct. at 2796; *United States v. Hall*, 93 F.3d 1337, 1341 (7th Cir.1996). The Supreme Court explained that this requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. at 2796–97. On appeal, Yoon argues that Agent Wolverton's testimony and methodology did not fit the circumstances of this case and was therefore improperly admitted, and that the district court never made the requisite preliminary findings as to the reliability and relevance of the expert testimony as contemplated by *Daubert*. We review that argument de *novo*. *Hall*, 93 F.3d at 1342.

Yoon's argument could not be farther from the mark. Our review of the trial transcript indicates that the district court properly made the preliminary findings. The district court ruled that the government "has sufficiently established Mr. Wolverton's expertise in the relatively narrow discipline of forensic analysis being check-kiting schemes. And he certainly has the minimal education and experiential qualifications." The court further found that Agent Wolverton's methodology is "accepted within the field of expertise in which he purports to be knowledgeable" and that his testimony would aid the court, i.e., it would be relevant.

Moreover, our independent review of the trial transcript convinces us that Agent Wolverton's expertise, both as to his methodology and his experience, was perfectly fitted to the facts of this case. Agent Wolverton had been qualified as an expert in check-kiting in eight previous cases. Agent Wolverton testified that a check kite is "a systematic scheme to defraud whereby nonsufficient funds checks are traded between two or more checking accounts in order to artificially inflate the account balances. And this is accomplished by utilizing the float time in the banking system." He explained that cross-deposits could also be used in a check-kiting scheme by "cross-depositing or exchanging nonsufficient funds checks between commonly-held bank accounts controlled by the same person or persons." He explained that his methodology of analyzing check-kiting schemes involved examining bank records, including checks, deposit slips and bank statements, and then entering the information he garners from these bank records into a computer program called Check Kite Analysis System, or CKAS, which the FBI developed to analyze data in suspected check-kiting cases. In this case, Agent Wolverton examined the bank records himself, but the data was actually inputted into the computer program by an FBI financial analyst. Finally, Agent Wolverton offered his opinion that a check kite occurred here, which put the banks at risk of loss.

We take this opportunity to point out that Mrs. Yoon is somewhat mistaken in her understanding of the purposes of expert testi-

mony. She seems to argue that Agent Wolverton's testimony should be inadmissible because he did not testify as to whether Mrs. Yoon was guilty of or responsible for the check kite and whether she had knowledge of the scheme. She fails to see that Agent Wolverton did not have to testify to those things. No expert need testify as to every material issue in the case; in fact, it would be surprising if one could. Here, it was perfectly permissible for Agent Wolverton to describe check-kiting schemes, analyze the data in this case, and determine that, in his opinion, a check kite occurred. His inability to prove Mrs. Yoon's intent or knowledge of the scheme is of no moment—that was not why he was put on the stand. There were other witnesses who testified at trial to provide the evidence of Mrs. Yoon's knowledge of the scheme. The procedure here was a perfectly acceptable way to present evidence as to a complicated series of illegal financial transactions.

When pronouncing judgment, the district court stated: "[T]he Court embraces the methodology of Agent Wolverton and was persuaded by his evidence *without exception* about the existence of a scheme, a check kiting scheme." The district court was perfectly correct, and we will not disturb its determination by finding an abuse of discretion.

### IV. Susan Heller's Testimony

■ Mrs. Yoon next argues that the district court committed reversible error in relying on Susan Heller's testimony because it was so general and conclusory that it violated her Confrontation Clause rights under the Sixth Amendment, and that some of Heller's testimony was hearsay. Mrs. Yoon also argues that the admission of Heller's testimony as "habit" evidence under Rule 406 was erroneous. *See* FED.R.EVID. 406. In short, Mrs. Yoon wants us, on appeal, to tell the district court to exclude Heller's testimony.

■ We cannot do this. The district court has broad discretion in determining the admissibility of evidence, and we review the district court's rulings on the admission of evidence for abuse of discretion. *United States v. Payne*, 102 F.3d 289, 294 (7th Cir.

1996). In light of the very relevant nature of Heller's testimony, we will hardly interfere with the district court's discretion in admitting it. The evidence was not introduced as "habit" evidence pursuant to Rule 406, so Mrs. Yoon's argument is misplaced. Rather, Heller testified as to her own personal knowledge of the workings of the Yoons' office on the days when she was present. This evidence was introduced to show that Mrs. Yoon had knowledge of the business finances and the checking accounts at issue in this case. Mrs. Yoon is correct that this testimony prejudiced her—Heller's testimony, along with Rasho's were important in establishing Mrs. Yoon's state of mind. However, we find absolutely no reason to substitute our judgment for that of the district court, and we are certainly not in a position to question how much weight the district court gave to the testimony. The court was, in a much better position then we are to evaluate the credibility and reliability of witnesses. In short, we do not find any abuse of discretion in the district court's decision to admit Heller's testimony and we certainly find nothing in it to warrant reversal.

### V. Sentencing Issues

■ Finally, Mrs. Yoon raises four different issues regarding her sentence, all involving the district court's application of the Sentencing Guidelines. Our course in reviewing these decisions is, by now, well-charted. We review the district court's interpretation of the scope of the guidelines *de novo* and its factual findings for clear error. *United States v. Binford*, 108 F.3d 723, 726 (7th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 2530, 138 L.Ed.2d 1029 (1997).

At sentencing, the district court found that Mrs. Yoon's adjusted base level was 17, with a criminal history category of I, creating a sentencing range of 24 to 30 months. The district court chose to sentence Mrs. Yoon at the low end of the guideline range, to 24 months, to be followed by a three-year period of supervised release. He also ordered her to perform 300 hours of community service and to pay $7,500 restitution to the Foster Bank. The district court denied a motion for

a reduction in her sentence for acceptance of responsibility, finding that Mrs. Yoon had put the government to its burden at trial and had not admitted her guilt or expressed remorse for her criminal behavior. The district court also refused to depart downward from the Guidelines based on family circumstances.

Mrs. Yoon first argues that the district court should have given her a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) because she made voluntary restitution payments prior to her finding of guilt. The district court, after hearing counsel's argument, determined that the reduction was not warranted. Mrs. Yoon is not automatically disqualified from receiving this reduction because she went to trial. *See* U.S.S.G. § 3E1.1, application note 2. However, in light of the fact that she disclaimed having knowledge of the scheme and proclaimed her innocence from start to finish, including at the sentencing hearing and on appeal, we find that the district court's decision not to grant the reduction was well "within a zone of reasonable responses to the facts." *United States v. Gomez*, 24 F.3d 924, 926 (7th Cir.), *cert. denied*, 513 U.S. 909, 115 S.Ct. 280, 130 L.Ed.2d 196 (1994). Moreover, Yoon's case is distinguishable from *United States v. Bean*, 18 F.3d 1367 (7th Cir.1994), in that in *Bean*, the defendant repaid the entire loss before trial, which justified the district court's award of the acceptance of responsibility reduction. In this case, as the government points out, 75% of the banks' total losses remain unpaid. The decisive point is not that the entire balance was not repaid, and the district court did not think it was. Rather, the district court found that the only partial repayment *combined with* the profession of innocence throughout the proceedings supported its decision not to grant the reduction. Given the facts and circumstances in this case, the district court's decision was not erroneous.

Next, Mrs. Yoon argues that the district court should have given her a four-level reduction under U.S.S.G. § 3B1.2 based on the fact that she had minimal involvement in the check kite. Section 3B1.2 allows minimal participant status to be afforded to those "who are plainly among the least culpable of those involved in the conduct of a group … [and who] lack knowledge or understanding of the scope and structure of the enterprise and of the activities of others." U.S.S.G. § 3B1.2, application note 1. After hearing argument on this issue at sentencing, the district court found the contention that Mrs. Yoon was a minimal participant to be "ludicrous." The district court went through the substance of the evidence against Mrs. Yoon yet again to support its belief that she was integrally involved in the check-kiting scheme, stating: "The suggestion—and that's all it can be in light of the evidence at trial—that she was not equally culpable with her fugitive husband strains credulity, to say the very least." The district court's comments showcase its belief that Mrs. Yoon was highly involved in the scheme. The court also stated that the evidence did not show that Mrs. Yoon was "like a barber pole standing there with all of these transactions going on around her, and she didn't know anything about it and, therefore, she can't be held responsible for it. … [T]hat is not what the evidence showed." In light of the sufficiency of the evidence as to Mrs. Yoon's participation in the scheme and her knowledge of the finances of these businesses, we find no error in the district court's decision not to grant the reduction.

Yoon also alleges that the district court erred in failing to grant her motion for a downward departure based on family circumstances. We have no jurisdiction to review a district court's discretionary refusal to depart downward unless the sentence was imposed in violation of the law or as the result of an incorrect application of the Guidelines. *United States v. Winters*, 117 F.3d 346, 348 (7th Cir.1997). In this case, the district court's statements at the sentencing hearing indicate that it knew it had authority to depart, but that, in its discretion, it did not believe the facts of the case warranted such a departure. Under these circumstances, we do not have jurisdiction to review Mrs. Yoon's claim.

Finally, Yoon argues that the district court erred in ordering her to pay restitution to the Foster Bank in the amount of $7,500. We review this order for abuse of

discretion. *United States v. Murphy*, 28 F.3d 38, 40 (7th Cir.1994). In deciding whether to order restitution and, if so, in what amount, the district court must consider the amount of the victim's loss, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents. *United States v. Jaroszenko*, 92 F.3d 486, 491 (7th Cir.1996); *see also* 18 U.S.C. § 3664(a). We will sustain the district court's order of restitution if it is apparent that the district court considered the statutory factors. *Murphy*, 28 F.3d at 41. Here, the district court denied the motion because Mrs. Yoon was only forty-four years old and would be expected to maintain gainful employment while on supervised release. In addition, the district court ordered Mrs. Yoon to pay only $7,500, when the total amount of uncompensated loss was $349,000. The court further ordered her to make monthly installment payments, which shows its awareness of her ability to pay and her overall situation. Because the district court appears to have considered the statutory factors, we find no abuse of discretion and uphold the order of restitution.

### Conclusion

For the foregoing reasons, the conviction and sentence of Susanne Yoon are AFFIRMED.