# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-2289/2290

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee/Cross-Appellant, | * |
| | * Appeals from the United States |
| v. | * District Court for the District of |
| | * Nebraska. |
| John C. Whitehead, | * |
| | * |
| Appellant/Cross-Appellee. | * |

_____

Submitted: January 14, 1999
Filed: April 8, 1999

_____

Before BOWMAN, Chief Judge, MURPHY, Circuit Judge, and VIETOR,[1] Senior District Judge.

_____

VIETOR, Senior District Judge.

John C. Whitehead appeals on numerous grounds his convictions of two counts of bank fraud under 18 U.S.C. § 1344(1), and one count of making a false statement to a financial institution under 18 U.S.C. § 1014. Count I of the indictment charges a violation of § 1344(1) based on an alleged check kiting scheme involving four federally insured financial institutions running from October 1991 through March 1992. Count II charges a violation of § 1344(1) based on an alleged scheme to

_____

[1]The Honorable Harold D. Vietor, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

defraud Columbus Bank and Trust Company ("CBTC"), in connection with a loan forgiveness agreement entered between Whitehead and CBTC on January 4, 1990. Count III charges a violation of § 1014 based on an alleged misrepresentation of insolvency that Whitehead made to CBTC in the January 4, 1990, loan forgiveness agreement. Whitehead also appeals from the district court's sentence on all counts, arguing the court improperly determined the amount of loss. The government cross-appeals the loss calculation with regard to Count I. For the reasons discussed below, we reverse Whitehead's convictions on Counts II and III and remand for a new trial on these counts in accordance with this opinion. We affirm the conviction on Count I, but remand for re-sentencing in accordance with this opinion.

## EVIDENCE AT TRIAL

Whitehead was engaged in a farming enterprise in the 1980s. In 1987, Whitehead and his wife, Linda, maintained three credit lines at CBTC—one for Whiteacre Farms, a farming operation; one personal; and one for Whitehead Brothers, a general partnership comprised of Whitehead and his wife and Whitehead's brother and his wife. The Whitehead Brothers credit line stemmed from a March 19, 1986, promissory note signed by all four members of the general partnership. The promissory note states that "I agree to provide to you, upon request, any financial statements or information you may deem necessary. I warrant that all financial statements and information I provide to you are or will be accurate, correct, and complete."

Each of the three credit lines were in default by late 1987. Also in late 1987, Whitehead and CBTC agreed that these credit lines would be liquidated and the underlying collateral sold. Pursuant to this agreement, Whitehead and CBTC executed a February 13, 1988, loan agreement ("Agreement") that provided for the forgiveness of the personal credit line in return for a cash payment of $35,000. The Agreement stated:

> Bank desires to express its release of claims against Whiteheads, and each of them, subject only to performance of this Agreement, and to enter into its binding, unconditional covenant to forego collection of any deficiency balance, and not to sue Whiteheads, or either of them, for any deficiency sums remaining after performance of the terms of this Agreement.

Whitehead's attorney, David Domina, drafted the Agreement. The Agreement did not cancel or forgive the Whitehead Brothers credit line. Domina testified that he explained to Whitehead that the Agreement would release Whitehead and his wife from personal liability from all three credit lines.

Whitehead was able to borrow the $35,000 from another financial institution, Equitable Savings & Loan Association ("Equitable"). In a letter written to Whitehead and his wife, Equitable stated that the $35,000 loan was "subject to our favorable review of a letter from your creditors indicating that the $89,000 deficit figure, which indicates your value in Whitehead Brothers, will not become a future cause of a deficiency action." In response to Equitable's request, CBTC wrote a letter dated July 13, 1988, to Whitehead and his wife stating: "This is to advise that the Columbus Bank and Trust Company will not instigate a deficiency legal action against you and Linda for any shortfall that may occur on the Whitehead Bros. credit line."

On July 17, 1988, Whitehead's mother-in-law died. Whitehead's wife inherited approximately $55,000 in cash and $77,000 in farmland from her. Whitehead never informed CBTC of this inheritance, but did inform other banks of these assets. On January 4, 1990, a loan forgiveness agreement ("Forgiveness Agreement") was entered into between CBTC, Whitehead and his wife, and Whitehead's brother and his brother's wife. The bank agreed that if Whitehead Brothers paid a total of $80,000, the bank would forgive the remaining principal and interest on the debt, totaling approximately $243,000. The Forgiveness Agreement contained this recital:

"Borrowers are insolvent and are unable to pay the total amount of the debt." Domina testified that Whitehead was insolvent at the time of the Forgiveness Agreement. Whitehead contended CBTC never required that he submit a personal financial statement in conjunction with the Forgiveness Agreement. An executive at CBTC testified that if Whitehead had been more forthcoming about his assets, including those inherited as a result of his mother-in-law's death, CBTC would have sought more money from Whitehead in exchange for the Forgiveness Agreement.

From October 1991 through April 1992, Whitehead engaged in a scheme involving four banks and five checking accounts. The banks include Sherman County Bank, Republic Bank of Nebraska, First National Bank and Trust Company ("First National"), and CBTC. All of the banks are located in Nebraska. The scheme consisted of Whitehead systematically depositing insufficient funds checks into one or more of the accounts that were drawn on accounts at the other banks. This activity erroneously inflated Whitehead's balances on the receiving bank's official books and records. First National honored the insufficient funds checks it received, but charged an overdraft fee. Whitehead payed these overdraft fees, but often used insufficient funds checks from other accounts to do so. This activity was a cyclical and continuous scheme. Over the six month period, for example, Whitehead wrote in the neighborhood of 50 insufficient funds checks to First National alone. On March 31, 1992, a $4000 check written by Whitehead on an account maintained at Sherman County Bank was returned to First National due to insufficient funds. First National personnel then inspected Whitehead's account, revealing activity indicating a check kiting scheme, and reported the activity to authorities. An investigation commenced, leading to Whitehead's prosecution in this case.

ISSUES ON APPEAL

Whitehead raises several issues on appeal. He challenges two of the district court's evidentiary decisions: (1) the admission, over his objection, of the

-4-

government's expert testimony on check kiting, and (2) the admission, over his objection, of evidence of events after July 13, 1988. Whitehead makes a Brady challenge to the government's alleged failure to reveal exculpatory material. Whitehead also contends that the district court erred when instructing the jury in two respects: (1) failing to give Whitehead's requested instruction regarding the legal standard for fraud under § 1344, and (2) failing to define for the jury the term "insolvent." Whitehead further contends that the verdicts on all three counts are not supported by sufficient evidence. Finally, Whitehead contends that at sentencing the district court miscalculated the amount of the loss on all Counts and improperly ordered restitution on Counts II and III. The government cross-appeals the district court's finding of loss regarding Count I.

## EXPERT TESTIMONY

FBI Special Agent Daniel Dubree testified as an expert for the government on check kiting activity. He testified to the meaning and definition of check kiting, explaining that a check kiting scheme "is a systematic depositing of nonsufficient funds checks into one or more accounts, which causes the bank balance on the official books and records of that bank to be increased, to be inflated." Tr. 563:21-24. Dubree also discussed some of the most common characteristics of check kiting:

> [T]he checks being written among the accounts are in whole dollar amounts, and that is they have no cents to them, for example $2000 even, $3000 even. Another characteristic is there's a substantially large volume of checks being written among the accounts that are within the common control of the parties involved. Other characteristics seems [sic] to be that there is a common control, that, for example, that in the situation where if one person's conducting a kite, they have caused or written the majority of the checks to be deposited. Normally there are [sic] more than one bank involved. . . .

Tr. 565:14-25.

-5-

Whitehead challenges the admissibility of Dubree's testimony, arguing that under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the expert's testimony should have been excluded.  We review district court decisions regarding the admissibility of expert testimony for an abuse of discretion.  See Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296 (8th Cir. 1996).  After a hearing that elicited detailed testimony regarding Dubree's background and methodology, the district court ruled, citing United States v. Yoon, 128 F.3d 515, 527-28 (7th Cir. 1997), that his testimony was reliable and would aid the trier of fact in understanding the evidence.  In Yoon, the defendants were convicted of bank fraud by way of a check kiting scheme in violation of 18 U.S.C. § 1344.  The Seventh Circuit Court of Appeals agreed with the trial court's decision to admit an FBI Special Agent's expert testimony regarding the series of financial transactions involved in the alleged scheme.  See Yoon, 128 F.3d at 528.  The Yoon court stated that the Special Agent's expertise "was perfectly fitted to the facts of this case," id. at 527, and that allowing such testimony "was a perfectly acceptable way to present evidence as to a complicated series of financial transactions."  Id. at 528.  The expert in Yoon used substantially the same methodology and offered similar testimony as the expert here.  Consequently, like the district court, we find the Yoon court's rationale and conclusions regarding the admission of the expert testimony applicable and persuasive.  We find no error; the district court properly acted within its discretion in allowing the expert testimony.

EVENTS AFTER 7-13-88

Whitehead also challenges the admissibility of the evidence concerning events occurring after July 13, 1988.  The government contends that the district court did not abuse its discretion in admitting the evidence.  Prior to trial, Whitehead filed a motion in limine, requesting exclusion of the evidence concerning events occurring after July 13, 1988, that related to his personal assets.  At trial Whitehead renewed his

objections contained in the motion in limine. Whitehead reasoned that the Agreement executed on February 13, 1988, and the July 13, 1988, letter written by CBTC, agreeing not to bring a deficiency action against Whitehead and his wife to collect the outstanding debt on the Whitehead Brothers credit line, extinguished his personal liability for any deficiency. In its order denying the motion in limine, the district court stated that the 1988 Agreement and letter did not irrefutably establish that Whitehead no longer possessed any personal liability on the outstanding Whitehead Brothers debt.

A district court's decision denying a motion in limine is reviewed for an abuse of discretion. See White Consol. Indus., Inc. v. McGill Mfr. Co., 165 F.3d 1185, 1192 (8th Cir. 1999) (stating that decisions regarding motions in limine are essentially evidentiary in nature, thus analyzed using an abuse of discretion standard); United States v. Tucker, 137 F.3d 1016, 1035 (8th Cir. 1998). We will reverse only "when an improper ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." United States v. Darden, 70 F.3d 1507, 1528 (8th Cir. 1995) (quoting United States v. Ballew, 40 F.3d 936, 941 (8th Cir. 1994)).

Based on the plain language of the Agreement and letter alone, the district court was correct in its conclusion. Through the Agreement and letter, CBTC did not eliminate or forgive Whitehead's debt, it merely promised not to institute a legal deficiency action. Additionally, the CBTC executive who wrote the letter, Robert Labenz, testified that he wrote the letter for the sole purpose of responding to Equitable's request and inducing its loan of $35,000. See Tr. 82:4-8. This testimony further supports the district court's ruling. We conclude that the district court did not abuse its discretion in denying Whitehead's motion in limine and in allowing evidence of events after July 13, 1988, to be introduced at the trial.

THE BRADY ISSUE

Whitehead argues that the district court erred in denying his motion to dismiss Count I of the indictment because the government failed to provide exculpatory material in violation of Brady v. Maryland, 373 U.S. 83 (1963). To succeed on a Brady claim,

> "[Whitehead] must show that the prosecution suppressed the evidence, the evidence was favorable to the accused, and the evidence was material to the issue of guilt or punishment." Evidence is material under Brady "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

United States v. Flores-Mireles, 112 F.3d 337, 339-40 (8th Cir. 1997) (internal citation omitted) (quoting United States v. Duke, 50 F.3d 571, 577 (8th Cir. 1995)). The government need not disclose evidence that is, inter alia, available through other sources or not in the possession of the prosecutor. See Flores-Mireles, 112 F.3d at 340.

The material in issue is a pre-trial statement by Gerald Micek, a commercial lender at First National Bank in Columbus, Nebraska, one of the financial institutions involved in the scheme alleged in Count I. In a pretrial interview with government agents, Micek opined that Whitehead did not engage in check kiting. Despite Whitehead's discovery request and a court order directing the government to release all Brady material, the government did not inform Whitehead of Micek's statement. Whitehead's counsel, however, interviewed Micek prior to trial and learned of his statement to the prosecution. During the trial, Whitehead's counsel cross-examined Micek regarding his statement. Obviously, Micek's opinion was made available to the defense through a source other than the government—Micek himself.

Even if the government had disclosed Micek's statement, this court concludes that there is not a reasonable probability that the result of the trial on Count I would have been different. During cross-examination, Micek testified that he had told

members of the prosecution team that in his opinion Whitehead had not engaged in check kiting because the bank was in no way defrauded. Thus, the government's alleged suppression of the statement did not prevent the statement from surfacing at trial. Notwithstanding Micek's opinion, the jury found Whitehead guilty. The statement was not, therefore, material evidence. Whitehead's <u>Brady</u> challenge fails.

## JURY INSTRUCTIONS

Whitehead objects to two of the district court's jury instructions. This court reviews a district court's decision to grant or deny a request for a particular jury instruction under an abuse of discretion standard, taking into account the full context of the charge. See <u>Tucker</u>, 137 F.3d at 1036; <u>United States v. Dreamer</u>, 88 F.3d 655, 658 (8th Cir. 1996) ("We review the adequacy of the jury instructions by considering them as a whole."). A defendant is entitled to a specific jury instruction "that conveys the substance of his request if his request is timely, it is supported by evidence in the case, and is a correct statement of the law." <u>Tucker</u>, 137 F.3d at 1036. This entitlement does not guarantee that a defendant will be granted a particular formulation. Instead, a district court may fashion its own instruction that adequately conveys the law. See <u>id.</u> A reversal of a conviction is warranted only if the district court's alleged erroneous failure to give a particular instruction was prejudicial. See <u>United States v. Whatley</u>, 133 F.3d 601, 604-05 (8th Cir. 1998).

<u>Failure to Give Requested Fraudulent Intent Instruction on Count I</u>

Whitehead challenges as reversible error the district court's failure to give his requested instruction pertaining to Count I. The district court gave the following instruction, No. 16:

The phrase "scheme or artifice to defraud" means a deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of

something of value. The government must show that some actual harm or injury was contemplated by the defendant.

It is not necessary for the government to prove that anyone lost any money or property as a result of the scheme or plan to defraud.

Whitehead argues that this court's holding in United States v. Jain, 93 F.3d 436 (8th Cir. 1996), supports his position that the jury should have been further instructed, as he requested, as follows:

In regard to the charge of bank fraud in Count I, you are instructed that the Court has found as a matter of law that no bank suffered a loss.

Consequently, the Government has an additional burden of proof on Count I, beyond the elements set forth in Instruction No. 2 [sic].[2]

_____

[2]Whitehead's reference to Instruction No. 2 is probably a reference to his requested instruction outlining the elements of Count I. The district court's Instruction No. 14 outlines the elements of Count I. No. 14 states:

Count I of the Indictment charges that the defendant, John C. Whitehead, from on or about March 1, 1991 to on or about March 31, 1992, in the District of Nebraska, did knowingly execute a scheme or artifice to defraud four financial institutions insured by the Federal Deposit Insurance Corporation, namely, Columbus Bank and Trust Company, First National Bank and Trust Company, Sherman County Bank, and Republic Bank of Nebraska, in that the defendant, John C. Whitehead, conducted transactions called "check kiting."

Section 1344 of Title 18 of the United States Code provides, in part, that:

"Whoever knowingly executes . . . a scheme or artifice to defraud a financial institution shall be guilty of an offense against the United States."

The crime of bank fraud, as charged in Count I of the Indictment, has three essential elements, which are:

One, the defendant knowingly executed a scheme and artifice to defraud four financial institutions;

-10-

The Government must prove, beyond a reasonable doubt, that some harm or injury was contemplated by John C. Whitehead. In other words, the Government must produce evidence independent of the alleged scheme to show defendant Whitehead's alleged fraudulent intent.

(Footnote added). Whitehead's proposed jury instruction is incorrect. The evidence would not permit the district court judge to find as a matter of law that the bank suffered no loss. Furthermore, Whitehead's proposed instruction misstates the law. Whitehead is incorrect in stating that in order to prove a contemplation of harm or injury evidence independent of the scheme itself must be offered. The scheme itself often serves as evidence of a defendant's intent to defraud. See Yoon, 128 F.3d at 523 (discussing the defendant's intent to defraud, the court stated that "[w]hile it is true that there is no evidence that [the defendant] said, 'I intend to defraud these banks,' the sheer numbers of checks and amounts of money involved in this scheme during the ten-month period provide a surrogate for [the defendant's] knowledge").

Moreover, Whitehead misapplies our decision in Jain to the facts here. We stated in Jain that under the mail fraud statute, "[t]he essence of a scheme to defraud is an intent to harm the victim." Jain, 93 F.3d at 442; see United States v. Mueller, 74 F.3d 1152, 1159 (11th Cir. 1996) (stating that the bank fraud statute is modeled on the mail fraud statute); United States v. Saks, 964 F.2d 1514 (5th Cir. 1992) (discussing the applicability of decisions under the mail fraud statute to the bank fraud statute). At a minimum, there must be a "cognizable scheme to defraud." Jain, 93 F.3d at 442 (quoting United States v. McNeive, 536 F.2d 1245, 1252 (8th Cir. 1976)). Based on this standard, in Jain we overturned a conviction under the mail

Two, the defendant did so with intent to defraud; and

Three, the financial institutions were insured by the Federal Deposit Insurance Corporation.

Negotiating an insufficient funds check, in and of itself, is not a criminal act.

* * * *

fraud statute because, <u>inter</u> <u>alia</u>, the government failed to show, at a minimum, a scheme to defraud, or in other words, that the defendant intended to cause harm. <u>See</u> <u>id.</u> Sufficient evidence exists to find that Whitehead engaged in a scheme to defraud, and also that he intended to cause harm to the victim banks. This evidence consists of testimony of witnesses, including an expert witness, and numerous bank records placed in evidence.

Admittedly, in <u>Jain</u> we noted that the government shouldered an additional burden of providing evidence independent of the alleged scheme to show an intent to defraud. This burden existed, however, because there was insufficient evidence of both a scheme to defraud and actual harm. In Whitehead's case, the government provided sufficient evidence of both a scheme to defraud and actual harm.

The instruction given by the district court regarding Count I adequately reflected the evidence produced at trial and communicated the proper legal standard to the jury. The district court did not abuse its discretion in refusing to give Whitehead's additional requested instruction pertaining to Count I.

<u>Failure to Give Requested "Insolvent" Definition Instruction—Counts II and III</u>

Whitehead also contends that the district court committed prejudicial error in respect to Counts II and III by refusing to instruct the jury on the legal definition of the term "insolvent." At the jury instructions conference, Whitehead's attorney and the district court judge had the following exchange:

> Attorney: Judge, just to make sure our record is complete, we would also add [sic] the Court – request the Court to instruct the jury as a matter of law that an accepted definition of "insolvency" is inability –
>
> The Court: Where did you tender that? Which instruction are you talking about?

Attorney: I'm making an oral motion now. I think we made it during trial. But we are asking the Court to instruct the jury as a matter of law that the term "insolvency" includes a definition that an individual is unable to pay their debts as they accrue in the normal course of business.

The Court: Well, that's – Mr. Domina said you can use either one.

Attorney: That's correct, that's why we're asking for that. And also –

The Court: Well, I think he said it's – depends on which definition you want to use.

Tr. 1164:13-25, 1165:1-5. The government does not dispute that the proffered definition of "insolvent" is an accurate statement of the law; it argues only that the requested instruction was not necessary, and that its absence was not prejudicial error. The government's argument lacks merit; we agree with Whitehead.

The district court gave the jury two instructions that incorporated the term "insolvent." In explaining the government's burden on Count II in Instruction No. 15, the district court instructed the jury that

> Count II of the Indictment charges that the defendant, John C. Whitehead, from on or about December 1, 1987 to on or about January 4, 1990, in the District of Nebraska, did knowingly execute a scheme or artifice to defraud the Columbus Bank and Trust Company culminating in a loan forgiveness agreement with the Columbus Bank and Trust Company wherein the defendant falsely stated that he was insolvent on January 4, 1990.
> * * * *

Instruction No. 17 reads:

> Count III of the Indictment charges that on or about January 4, 1990, in the District of Nebraska, the defendant, John C. Whitehead,

-13-

knowingly made and caused to be made the false statement that he was insolvent in conjunction with the loan forgiveness agreement submitted by him to the Columbus Bank and Trust Company and that the defendant made the false statement for the purpose of influencing the action of the Columbus Bank and Trust Company to approve the loan forgiveness agreement of January 4, 1990.

\* \* \* \*

The crime of making a false statement to a financial institution, as charged in Count III of the Indictment, has three essential elements, which are:

One, the defendant knowingly made a false statement that he was insolvent on January 4, 1990;

Two, the defendant made the false statement for the purpose of influencing the action of the Columbus Bank and Trust Company upon the loan forgiveness agreement on January 4, 1990; and

Three, that the Columbus Bank and Trust Company was insured by the Federal Deposit Insurance Corporation.

A statement is "false" if the statement is untrue when made.

\* \* \* \*

As the district court recognized in Instruction Nos. 15 and 17, Counts II and III turned on the issue of whether Whitehead knowingly made a false representation of insolvency. In fact, both the district court and the government noted that the issue of insolvency was a threshold question for the jury. See United States v. Whitehead, Docket No. 8:96CR119, at 2 (D. Neb. April 6, 1998) (District Court Order) ("In order to find the defendant guilty of Counts II and III of the indictment, the jury had to find that the defendant's representation of insolvency was false on January 4, 1990."); Brief for Appellee at 28 ("In order to find the Appellant guilty of Counts II and III of the Indictment, the jury had to find that the Appellant's representation of his insolvency in the January 4, 1990, loan forgiveness agreement was false."). Despite the centrality of this term to Counts II and III, the district court failed to define insolvency for the jury.

The government argues, echoing the view of the district court, that the term "insolvent" is one with a common usage and understanding, and that when used in the loan forgiveness agreement it had no special meaning. This argument lacks merit. The term "insolvent" encompasses distinctly different meanings in the law. An insolvent person means someone who "cannot pay his or her debts as they become due." Neb. Rev. Stat. § 1-201(23) (Uniform Commercial Code); see also Neb. Rev. Stat. § 36-703(b) (Uniform Fraudulent Transfer Act) ("A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent."); Black's Law Dictionary 716 (5th ed. 1979) ("[Insolvency is] . . . the condition of a person who is unable to pay his debts as they fall due, or in the usual course of trade and business."). Insolvency also means a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A) (Bankruptcy Code); see also Neb. Rev. Stat. § 36-703(a) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."). Even the dictionary definition, which could be thought to inform jurors' "common sense" and "general understandings" of the term, provides a two-tiered definition for "insolvent." See Webster's Third New International Dictionary 1170 (1986) (defining insolvent as "unable or having ceased to pay debts as they fall due in the usual course of business;" or more specifically as "having liabilities in excess of a reasonable market value of assets held"). The dictionary's two-tiered explanation for the term insolvent illustrates that in general usage the term is of a complex nature, thus warranting explanation.

In their entirety, the instructions lack explanation of the term "insolvent," despite the fact that this term was a determinative component of Counts II and III. "[W]here terms are not readily understood by the jury or where the possibility of confusion concerning a term exists, the court should define or explain such term." Westborough Mall, Inc. v. City of Cape Girardeau, 794 F.2d 330, 338 (8th Cir. 1986); cf. Federal Enters., Inc. v. Greyhound Leasing & Fin. Corp., 786 F.2d 817, 819 (8th Cir. 1986). In the absence of such an explanation, the jury was left to speculate about

the meaning of this key term. The potential for such speculation and possibility of confusion was prejudicial to Whitehead's case.

Implicitly acknowledging that more than one definition exists for the term insolvent, the district court stated that "there was sufficient evidence from which the jury could reasonably find that the defendant was solvent on January 4, 1990, under any meaning of the terms 'insolvency' and 'insolvent.' " United States v. Whitehead, Docket No. 8:96CR119, at 3 (D. Neb. April 6, 1998) (District Court Order). While we agree with the district court that the government presented sufficient evidence on Counts II and III, this does not eliminate the prejudice caused by failing to instruct the jury on the term "insolvent." Even though there was sufficient evidence to convict on Counts II and III, it is entirely possible, based on the evidence presented, that the jury could have reached a not guilty verdict on both counts had it been instructed that one definition of the term insolvent is the inability to pay debts as they come due. In the same vein, it is entirely possible that the jury arrived at its verdict based solely on the view that the definition of the term insolvent includes only the fair market value of assets being less than debts. We can only speculate about this point, which further illustrates the prejudice caused by the district court's failure to instruct the jury as to the definition of the term insolvent. Consequently, we must reverse Whitehead's convictions on Counts II and III and remand for new a new trial on these counts. Because we reverse and remand for a new trial, we need not address Whitehead's complaints about loss and restitution on these counts.

## SUFFICIENCY OF EVIDENCE

Whitehead argues that the evidence produced at trial was insufficient to support his convictions as to all counts. In reviewing the sufficiency of the evidence, this court must adhere to a strict standard. We may reverse a conviction "only if no reasonable jury could have found [the defendant] guilty beyond a reasonable doubt." United States v. Hawkey, 148 F.3d 920, 923 (8th Cir. 1998). Moreover, this court

-16-

cannot weigh the evidence, and all inferences about and examinations of the evidence are drawn in a light most favorable to the verdict. See id.

Under § 1344(1), the government must prove beyond a reasonable doubt that Whitehead "knowingly execute[d], or attempt[ed] to execute, a scheme or artifice . . . to defraud a financial institution." 18 U.S.C. § 1344(1). This standard requires evidence that the defendant intended to defraud the victim financial institution. See United States v. Clapp, 46 F.3d 795, 803 (8th Cir. 1995); United States v. Stavroulakis, 952 F.2d 686, 694 (2d Cir. 1992). Whitehead principally challenges the sufficiency of the evidence offered to support the intent to defraud element of § 1344(1). Cf. Hawkey, 148 F.3d at 924. In waging such a challenge, Whitehead argues three points: (1) the bank did not suffer a loss; (2) the record lacks a claim by the bank that it was defrauded; and (3) the evidence demonstrated an "informal overdraft protection system" that negated the intent element. We easily dispose of Whitehead's first point. The government need not prove loss to show that a defendant committed bank fraud under § 1344. See United States v. Ponec, 163 F.3d 486, 487 (8th Cir. 1998) ("We hold, among other things, that the crime of bank fraud under 18 U.S.C. § 1344 does not require a showing that the defrauded bank suffered a financial loss."). We also easily dispose of Whitehead's second point. Fraud can be proven in numerous ways; the government need not specifically prove that bank personnel claimed the bank was defrauded. Cf. United States v. Saks, 964 F.2d 1514, 1518 (5th Cir. 1992).

Lastly Whitehead argues that there was an "informal draft protection system" that in effect negates the existence of criminal intent. This so-called "informal draft protection system" was the routine practice of a bank, First National for example, deciding to honor an insufficient funds check, allow the overdraft, and then charge an overdraft fee. In response to this argument, the government cites United States v. Unruh, 855 F.2d 1363 (9th Cir. 1987), and contends that such a "system" is not a per se defense to check kiting. Instead, argues the government, such a "system" is an

evidentiary matter for the jury's consideration. While the <u>Unruh</u> case dealt with the analogous § 656 of Title 18 of the United States Code, we agree with its rationale that valid consent is not dispositive on the intent element. Instead, evidence of consent is for the jury to consider in deciding the issue of intent. <u>Cf.</u> <u>United States v. Ripinsky</u>, 109 F.3d 1436, 1441 (9th Cir. 1997), <u>opinion</u> <u>amended</u> <u>on</u> <u>denial</u> <u>of</u> <u>reh'g</u>, 129 F.3d 518 (9th Cir. 1997) ("While <u>Unruh</u> involved section 656 rather than section 1344, the same concerns apply [to § 1344]."); <u>United States v. Woods</u>, 877 F.2d 477, 480 (6th Cir. 1989) (discussing that the requisite intent to defraud is the same for 18 U.S.C. §§ 656 & 1344). In light of our conclusions here, our strict mandate for review, and the evidence contained in the record, we hold that there was sufficient evidence for the jury to convict the defendant of the crime charged in Count I of the indictment.

Likewise, the evidence introduced in support of Counts II and III was sufficient to sustain convictions on those counts, albeit those counts must be retried because of error in the instructions.

SENTENCING—AMOUNT OF LOSS

The government cross-appeals on the issue of the amount of loss on Count I that the district court found for the purpose of determining the offense level under § 2F1.1 of the United States Sentencing Guidelines. The district court determined the amount of loss to be $4000, which the government argues under-represents the actual loss. The government contends the actual loss is $30,823.30. Whitehead argues the district court erred, contending that the actual loss is zero.

We apply a clearly erroneous standard of review to a district court's finding of loss under § 2F1.1 of the United States Sentencing Guidelines. <u>See</u> <u>United States v. Morris</u>, 18 F.3d 562, 570 (8th Cir. 1994). We review <u>de</u> <u>novo</u> the district court's

construction and application of the Sentencing Guidelines. See United States v. Wells, 127 F.3d 739, 746 (8th Cir. 1997).

The pre-sentence report prepared for Whitehead's sentencing determined the actual loss on Count I to be $4000. This figure was determined after a review of numerous documents. The $4000 figure is the total amount in float when the check kiting scheme ended on April 1, 1992. The government objected to this figure. Relying on a report prepared by FBI Supervisory Special Agent Daniel D. Dubree, the government argued the loss totaled $30,823.30. Agent Dubree refers to this figure as the "cumulative loss." This "cumulative loss" figure reflects the cumulative amount of overdrafts, disregarding any deposits made before the discovery of the check kiting scheme.

At the sentencing hearing, the district court found that Whitehead did not intend to cause a loss to the victim banks. The government does not dispute this finding on appeal and we accept the finding as it was not clearly erroneous under all the evidence presented. Cf. United States v. Shaffer, 35 F.3d 110, 113 (3d Cir. 1994). The United States Sentencing Guidelines direct courts to consider the actual loss if this figure exceeds that of the intended loss. U.S.S.G. § 2F1.1 n.8 (1998). Since the district court found the intended loss was zero, it was correct in proceeding to consider the actual loss. The district court found that the actual loss was $4000 based on all the evidence submitted. The $4000 figure reflected, according to the district court, the amount of the "insufficient fund check that had to be covered when the check kiting was discovered," or the amount in float at the time of discovery. In arriving at this figure, the district court rejected both Whitehead's argument that the total loss was zero and the government's position that the total loss was $30,823.30. Whitehead reasoned the total loss was zero, in part, because he pledged $4000 to satisfy the amount in float. The district court rejected Whitehead's position because the $4000 in restitution was pledged to satisfy the amount in float after the scheme was discovered. The district court properly rejected Whitehead's argument. The

amount of actual loss is determined at the time the check kiting scheme is discovered, not at the time of sentencing, meaning that restitution made after the discovery does not offset the total amount of loss. See, e.g., United States v. Akbani, 151 F.3d 774, 778 (8th Cir. 1998); cf., e.g., United States v. Flowers, 55 F.3d 218, 221-22 (6th Cir. 1995) ("'The fact that a check kiter enters into a repayment scheme after the loss has been discovered does not change the fact of the loss . . . .'") (quoting United States v. Mau, 45 F.3d 212, 216 (7th Cir. 1995)).

The district court's finding of a $4000 loss is not clearly erroneous and is in accordance with our recent holding in Akbani regarding loss determinations. See Akbani, 151 F.3d at 778-79 (discussing that the rule that the amount of loss is to be determined at the time of the check kiting discovery should not be narrowly read as to prevent consideration of outstanding fraudulent checks not yet submitted for payment). Accordingly, we uphold the district court's finding that the actual loss on Count I is $4000.

We AFFIRM the Count I conviction. We REVERSE the convictions on Counts II and III and remand for a new trial on those counts. We also remand on Count I for re-sentencing, since Whitehead's total offense level will be lower in the event he is not found guilty on re-trial of Counts II and III, and might be different even if he is convicted on Counts II and III.

A true copy.

  Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-20-