UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert LONGFELLOW, Defendant–
Appellant.

No. 94–1629.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1994.

Decided Dec. 22, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 3, 1995.

on evidentiary, statute of limitations and laches grounds. We affirm.

At all times relevant to this case, Robert Longfellow was President and Chief Executive Officer of Grant and Ross Township Community Credit Union in Hoopeston, Illinois (Credit Union). In March of 1986, the Illinois State Department of Financial Institutions (DFI) and the National Credit Union Administration took control of the Credit Union. After the takeover, officials from DFI and the Federal Bureau of Investigation reviewed files and interviewed employees concerning alleged improprieties in loans to Credit Union customers. Following this investigation, in November 1992 Longfellow was indicted for perpetrating a scheme to defraud the Credit Union. In a series of real estate transactions between 1980 and 1984, Longfellow allegedly made loans to borrowers so that they might buy property that he owned, failed to properly prepare and record the deeds and mortgages establishing the Credit Union's interest in these loans and property, and concealed his interest in these transactions from the other directors of the Credit Union. Longfellow's first trial in March of 1993 ended in a hung jury; he was reindicted and in a second trial in November 1993 was convicted of violating 18 U.S.C. § 1344(2) (bank fraud), 18 U.S.C. § 1006 (false reports to a credit union) and 18 U.S.C. § 657 (embezzlement from a credit union). He was subsequently sentenced to three years imprisonment, $50,000 in fines and $67,342.02 in restitution.

Hilary W. Frooman, Asst. U.S. Atty. (argued), Urbana Div., Urbana, IL, for plaintiff-appellee.

J. Steven Beckett, Holly Clemons (argued), Beckett & Associates, Urbana, IL, for defendant-appellant.

Before CUMMINGS, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Robert Longfellow appeals his conviction for bank fraud, false reporting to a credit union and embezzlement from a credit union

## I. Facts

Robert Longfellow began working for the Credit Union in the late 1950s, became its full-time Manager in the 1960s and at the time of these alleged incidents had become President and Chief Executive Officer. While holding this position he made a series of loans to Credit Union members, which the members in turn used to purchase property owned by Longfellow. These transactions were neither fully nor properly recorded, and the titles to the property were left in Longfellow's name rather than being transferred to the Credit Union as collateral for the loans.

Longfellow asserts that he acted in the best interest of the Credit Union, and that he kept title to the property in his name because he intended to pay off the loans should problems arise.

The first such sale that Longfellow arranged was the purchase in December 1980 of Longfellow's lot and trailer by Larry and Leigh Ann Ward. Longfellow authorized a loan from the Credit Union for the $10,500 purchase price, prepared the documentation himself and kept the title to the property in his name. When the Wards failed to meet their payments in March of 1991, Longfellow took out a loan in his wife's name from the Credit Union and used that money to pay the balance of the Wards' loan.

Once he had recovered the lot and trailer from the Wards by paying off the loan, Longfellow resold the property to the Byerlys for $12,500, again authorizing a loan, completing the paperwork himself and retaining title to the trailer and land. The money from this sale was used to pay off the earlier loan in his wife's name. The Byerlys continued to pay on *their* loan until the Credit Union failed, at which point Longfellow deeded the property to the Byerlys.

In the third transaction, Longfellow sold another trailer and lot to Shirley Ann Leppard in October of 1982, again with a loan authorized by Longfellow and with no transfer of title as evidenced by the deed. The documents of sale were left blank except for Leppard's signature. After about a year, Leppard abandoned the trailer and stopped making payments.

In February of 1983, a DFI examiner performed a surprise examination of the Credit Union, finding a real estate loan file with incomplete documentation (a promissory note signed in blank). The examiner testified at trial that the Credit Union already had a history of incomplete documentation, that he explained to Longfellow and the other directors of the Credit Union that the blank note violated the Illinois Credit Union Act and that he had issued a "Cease and Desist" order citing the Credit Union for the incom-

plete note. Mr. Longfellow promised the examiner that in the future files relating to transactions would be completed.

Longfellow next sold a lot and mobile home to Donald Robinson in May 1983. Robinson already had an existing loan at the Credit Union, which was "rolled over" and added to the purchase price of the real estate. The mortgage was never recorded, nor was the deed transferred from Longfellow to Robinson. Robinson filed for bankruptcy one year later.

In June of 1983, Bobby Kinnaird also purchased a mobile home and lot from Longfellow, and also had a pre-existing loan rolled over and added to the price of the real estate. The promissory note, security agreement and mortgage were signed by the purchaser, but were otherwise blank. The loan was refinanced twice, first on July 31, 1984 and again in April 1985. The loan was apparently never paid, and Longfellow retained title to the property.[1]

The next sale was in February of 1984, when Daniel Brunner purchased a small house and lot from Longfellow, again with a loan Longfellow obtained for him from the Credit Union. Brunner subsequently received a second loan from the Credit Union to build a garage on the property. Once again, the documents were left mostly blank. The title to the property was never given to Brunner, although he did eventually pay off the loan after he sold the house in August of 1991.

Finally, Dani Means bought a house and lot from Longfellow in January of 1986. Once again, Longfellow arranged for an existing loan of Means' to be "rolled over" and combined with the purchase price, even though Means was already behind in his payments on the existing loan.

In March of 1986, the Illinois Department of Financial Institutions and the National Credit Union Administration took control of the Credit Union and began the process of investigating allegations of improprieties in loans to Credit Union customers.

---

1. One of the significant problems with this appeal is the failure by both parties to provide specific facts—a failing particularly of defendant Longfellow. We have construed the facts as best we can, given the somewhat sketchy information in the briefs and record.

## II. Analysis

Longfellow raises three issues on appeal, 1) that the district court committed reversible error in refusing to admit evidence of an unrelated land transaction in Watseka, Illinois because that evidence was relevant to Longfellow's motive and good faith defense, 2) that this prosecution was barred by the Statute of Limitations, and 3) that the prosecution was barred by the equitable doctrine of Laches.

### A. Watseka Land Transaction

■ Longfellow argues that he should have been permitted to present evidence regarding an unrelated purchase of land by the Credit Union in Watseka, Illinois. He claims that the details of this purchase, although unrelated to the sales of his own real estate in question here, will explain why he believed that keeping the title to real estate in his own name would be beneficial to the Credit Union.

In the Watseka transaction, the Credit Union sought to purchase land to open a branch in Watseka. However, before the Credit Union could officially purchase the land and hold title in its own name, it was required to obtain permission from the DFI. Because another organization was also trying to purchase the building in question, forcing the Credit Union to move quickly, the Board of Directors approved the purchase under Longfellow's name. The Credit Union's attorney prepared the paperwork, and the building was purchased and held in trust, with Longfellow holding all of the beneficial interest in the trust. On the advice of the Credit Union's attorney, Longfellow also signed a blank "assignment of beneficial interest," permitting his interest to be transferred to the Credit Union at any time.

The Credit Union then petitioned the DFI for permission to purchase the building. At first the permission was refused, and the DFI issued a Cease and Desist order because the Credit Union had not acquired prior approval. After repeated requests by the Credit Union's attorney and Board of Directors, however, the DFI approved the transfer of title to the Credit Union, with the understanding that the loans that Longfellow had received to purchase the building would be canceled upon completion of the transfer. Def.Br. at 25.

Longfellow contends that this transaction taught him that it was beneficial to the Credit Union for him to keep title to property in his name, and that Cease and Desist orders were not matters of great importance. The district court excluded this evidence on relevance grounds.

Longfellow argues that *United States v. Rubin*, 591 F.2d 278 (5th Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979), and *United States v. Martin–Trigona*, 684 F.2d 485 (7th Cir.1982), require that the Watseka evidence be admitted because it goes to his good faith defense. In *Rubin*, the defendant was accused of embezzling union funds and claimed lack of criminal intent as a defense. He argued that statements made by past presidents of the Union led him to understand that his actions in disbursing funds were proper under the Union's constitution, and that these statements were therefore improperly excluded as hearsay. The court concluded that the statements were not hearsay because they were not offered for the truth of the matter asserted, and that, because they were directly relevant to the defendant's intent, they should have been admitted.

In *Martin–Trigona*, the defendant was accused of mail fraud and had been prohibited from presenting any evidence of his good faith or lack of intent to defraud. Noting that it was difficult to determine exactly what good faith evidence the defendant had been trying to introduce, this Court ascribed its confusion to the fact that the defendant had also been improperly denied effective counsel. Thus we concluded that the defendant was entitled to introduce any legitimate good faith evidence that he had, and we remanded for further proceedings.

*Rubin* and *Martin–Trigona* certainly stand for the unexceptionable proposition that proper evidence of good faith should be admitted. However, they do not require that any evidence, no matter how tangential, irrelevant or otherwise inadmissible, must be admitted simply because the defendant claims

that it establishes his good faith. Here, the district court allowed other evidence of Longfellow's good faith, but concluded that there was "no parallel at all" between the Watseka situation, where Longfellow was acting "on behalf of the Credit Union, at the direction of the Credit Union, to acquire a goal of the Credit Union," and the transactions where Longfellow was selling his own property without informing anyone at the Credit Union. Tr. at 455.

■ We will not reverse the district court's evidentiary ruling absent an abuse of discretion. *United States v. Fryer,* 974 F.2d 813 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 641 (1993); *United States v. Biesiadecki,* 933 F.2d 539 (7th Cir.1991). In the Watseka transaction Longfellow not only informed the Board of Directors of his actions, but had their permission and help as well as that of the Credit Union's attorney. None of these factors were present in the transactions in the present case. There was no abuse of discretion here.

### B. Statute of Limitations

■ Longfellow next argues that Count I of the indictment, charging him with defrauding a bank in violation of 18 U.S.C. § 1344, was barred by the Statute of Limitations.

The parties do not dispute that the Statute of Limitations for financial institution crimes was five years at the time that Longfellow made his loans. They also agree that 18 U.S.C. § 3293, which took effect in August of 1989, established a new ten-year Statute of Limitations for financial institution crimes. Application of the new ten-year period is retroactive to crimes committed before the enactment of § 3293 in August of 1989, but only if the previous five-year Statute of Limitations on the alleged incident had not already expired by that time. Pub.L. 101–73 § 961(*l* )(3). Thus, Longfellow's 1992 indictment can only involve those acts whose five-year Statute of Limitations had not run before August of 1989, or in other words, those acts that occurred after August 1984.

The bank fraud statute, 18 U.S.C. § 1344, provides that:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Longfellow questions his conviction, under Count I of the indictment, for violating this statute. Count I charges generally that Longfellow defrauded the Credit Union by failing to provide proper documentation, neglecting to perform credit checks on borrowers, making loans for purchases of property that belonged to him, making false statements on documents and failing to obtain the approval of the Board of Directors. It lists the April 1982, October 1982, May 1983, June 1983, July 1984 and February 1984 loans as part of the scheme and gives the April 1985 refinancing of the Kinnaird loan as the "execution" of this scheme on which this Count is based.

Longfellow contests the use of these loans in Count I. He argues that each loan is a separate execution of the scheme, and that all except the refinancing of the Kinnaird loan are old enough to be barred by the Statute of Limitations. He further argues that the refinancing of the Kinnaird loan is not an "execution" under § 1344, but is instead essentially a continuation of a prior transaction and execution (the original loan to Kinnaird), which occurred in 1983 and for which he could have been indicted in 1983. The Statute of Limitations began to run on the original Kinnaird loan in 1983, and expired before the 1989 extension of the Statute of Limitations for financial institutions. Thus, Longfellow concludes, Count I of the indictment is invalid on Statute of Limitations grounds. Only if the refinancing of the Kinnaird loan in 1985 itself constitutes an "execution" of the scheme can Count I be brought within the Statute.

Determining exactly what constitutes an "execution" of a scheme is difficult. It is fairly well established that the bank fraud statute "punish[es] each execution of a fraudulent scheme rather than each act in furtherance of such a scheme." *United States v. Molinaro*, 11 F.3d 853, 859 (9th Cir.1993), *cert. denied*, — U.S. —, 115 S.Ct. 668, 130 L.Ed.2d 602 (1994); *United States v. Hord*, 6 F.3d 276, 281 (5th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994); *United States v. Heath*, 970 F.2d 1397, 1402 (5th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993); *United States v. Lemons*, 941 F.2d 309, 318 (5th Cir.1991); *United States v. Lilly*, 983 F.2d 300 (1st Cir.1992); *United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir.), *cert. denied*, 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990). However, a single scheme can be executed a number of times. *See, e.g., Hord*, 6 F.3d at 282; *United States v. Hammen*, 977 F.2d 379, 382–83 (7th Cir.1992); *Lemons*, 941 F.2d at 318. While "for each count of conviction there must be an execution," "[e]ach execution need not give rise to a charge in the indictment." *Hammen*, 977 F.2d at 383. Further, § 1344 was intended to be "construed broadly," and "actions that tend to prove the existence of the scheme will often be the actions actually taken to execute the scheme." *Hammen*, 977 F.2d at 383.

Attempts to define "execution" usually arise in the context of multiplicitous indictment analyses. Each act by the defendant may be labeled as either a simple, nonindictable "act in furtherance of a scheme," or an actual, chargeable "execution." Thus an execution is generally defined in terms of what it is not (the lesser "act in furtherance of the scheme"), and depends upon "the particular facts of each case." *Molinaro*, 11 F.3d at 860. The Ninth Circuit recently provided one of the few, if not the only, clear statement on the issue when it explained that a number of actions were indeed separate executions because they were "chronologically and substantively independent[,] [n]one depended on the others for its existence, [and] [e]ach had its own functions and purpose— they were interrelated only because they involved the same overall scheme." *Molinaro*,

11 F.3d at 860. In the case before us, the 1985 refinancing seems "chronologically" independent but whether it was "substantively" independent may be questioned.

Most courts considering the issue of whether an action was an "execution" have applied an "interrelatedness" standard in deciding exactly what parts of a scheme are executions. The ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, the number of parties involved and many other individual factors are all considered. As a result, a few courts have found seemingly separate acts to constitute only one execution. For example, in *United States v. Lilly*, 983 F.2d 300, the defendant's goal was to purchase a condominium complex. To do so he pre-sold the individual condominiums, falsifying documents and loan applications in the process, and then assigned the sales agreements to the bank as security for a loan to purchase the complex. Because all the documents were submitted together as security for one loan, the court held that together they constituted only one execution. *Id.* at 303. In this connection, it should be noted that the relevant events in this transaction were *not* chronologically separate.

Similarly, in *United States v. Heath*, 970 F.2d 1397, the defendants were attempting to sell a parcel of land in Florida that was rapidly decreasing in value. By falsely representing the value of the land, the defendants were able to convince a bank to lend ten million dollars to a buyer. However, the defendants also had to arrange for the bank to fund the purchase of some of the buyer's property in Arizona to enable him to pay the interest on the Florida loan. The court held that although there were two separate loans, the two loans were "integrally related" (one execution) because they were planned together, the Arizona loan was a prerequisite to the ultimate goal of the scheme (the sale of the Florida property) and "one could not have succeeded without the other." *Id.* at 1402. Again, there was also little chronological separation between the two loans.

Finally, in *United States v. Lemons*, 941 F.2d 309, the defendant arranged for his

savings and loan institution to make a large loan to a buyer of a real estate project. Part of the loan went to pay an assignment fee to yet another participant, from whom the defendant was to receive part of this assignment fee for himself. When the defendant finally was poised to receive the assignment fee he tried to prevent its discovery by arranging to get it in a series of transactions over six months rather than in one lump sum. The Fifth Circuit found that the goal of the scheme was to receive the assignment fee, and that even though it was divided up and disbursed in separate transactions, they were all part of "one performance, one completion, one execution of [a] scheme." *Id.* at 318. In *Lemons,* the defendant made plans to hide his gain the minute he was entitled to receive the money. The series of transactions to effectuate this deception covered a six-month period, but these transactions were all planned and contemplated at the time he was to receive the payment and they created no new gain for Lemons or risk for the bank. Hence, there was little basis to regard them as independent transactions.

However, many other cases of bank fraud have involved multiple, "separate and distinct" acts, and these cases have been held to include multiple executions. *Hord,* 6 F.3d at 280; *Lemons,* 941 F.2d at 316. *United States v. Hord* involved a scheme to deposit forged checks and then withdraw the money credited to the account, and each deposit was held to be a separate execution. 6 F.3d 276. The *Hord* court concluded that each deposit was a separate execution because "each deposit [put the bank] at risk," and the deposits "were not integrally related to one another, such that none could have succeeded without the others." *Id.* at 282. The court also held that the deposits were the executions of the scheme, rather than the opening of the bank accounts or the withdrawal of the money, because the deposits were what put the bank at risk.

Similarly, in *Molinaro,* 11 F.3d 853, the Ninth Circuit found each transfer of property to be an execution in a scheme where straw buyers purchased property to make a savings and loan look profitable and to conceal the real purchaser. However, falsifying the documentation to hide the real buyer in one of these transfers was not a separate execution. *See also Schwartz,* 899 F.2d at 248 (each deposit of fraudulent checks into account at single bank was separate execution); *United States v. Poliak,* 823 F.2d 371 (9th Cir.1987) (each check in a check-kiting scheme is a separate execution), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988).

Returning to the case at hand, Longfellow's pattern of granting loans to facilitate the sale of his own property, failing properly to record the sale and keeping the deeds in his own name constituted a scheme under § 1344. He executed the scheme a number of times when he arranged loans from the Credit Union, received the loan proceeds as payment for the property and failed to transfer title.

The question here is whether the refinancing of the Kinnaird loan also constituted a separate execution of this scheme. We face the problem that the refinancing was related to the loan made in 1983, but, on the other hand, the refinancing, like each deposit in *Hord,* created a new, independent risk for the Credit Union. Refinancing involved the granting of a new loan to the borrower because the refinanced loan capitalized (i.e. added to principal) the interest due but unpaid on the previous loan. This recalculation of principal allowed the unpaid interest to appear as a gain rather than a loss in the Credit Union's books. Refinancing also prevented the loan from appearing in the delinquent loan file, thus ensuring that both the new and old risks were hidden from the Board of Directors and the auditors.

By refinancing the loan, Longfellow was once again loaning the Credit Union's money on the basis of collateral (his real estate) that he kept in his own name. Although Longfellow himself received no additional cash as a result of the refinancing, he deprived the Credit Union of an opportunity for reimbursement through foreclosure. *See Hord,* 6 F.3d at 282 ("risk of loss, not just loss itself, supports conviction"). It is also persuasive that the first loan and the refinancing were not originally planned or contemplated together. The refinancing was entered into much later, when circumstances changed, in

order to "rescue" the original loan. These two acts were separated by two years, much longer than in other cases where only a single execution has been found.

The fact that the two loans are related, or that the same Credit Union and Credit Union member was involved in both does not necessarily make them part of the same execution. *See, e.g., Hord,* 6 F.3d at 282 (same victim does not prove only one execution). We believe that the refinancing can be held to be a separate execution, carried out long after the original loan. The refinancing was not part of a "single," "integrally related" act, *Lilly,* 983 F.2d at 303, *Heath,* 970 F.2d at 1402, closely planned and carried out in connection with the 1983 transaction. Rather, it was a separate act that created a new risk for the Credit Union and arguably involved a renewed gain for Longfellow. *See Molinaro,* 11 F.3d 853. In both granting and refinancing loans, Longfellow was using his position as Chief Executive Officer to benefit himself at the expense of the Credit Union, and despite the troublesome fact that no new cash passed to Longfellow in 1985, the refinancing can constitute an "execution" under the necessarily broad construction of § 1344. *See Hammen,* 977 F.2d at 382–83.

The Government did not attempt to indict Longfellow for each execution of the scheme, presumably because the earlier executions did not fall within the Statute of Limitations. However, there were executions of the scheme that did fall within the Statute of Limitations, i.e. the refinancing of the Kinnaird loan in 1985 and the Dani Means loan in January 1986, and the scheme continued until the Credit Union was taken out of Longfellow's hands in March of 1986. The fact that only one or two executions fell within the Statute of Limitations does not detract from the entire pattern of loans' be-

ing a scheme, and renders Longfellow no less culpable for the entire scheme.[2] Admittedly, this presents a question without clear precedent, which is therefore of considerable difficulty, but we believe that there is enough independent post–1983 conduct to satisfy the Statute of Limitations.

## C. Laches

■ Finally, Longfellow argues that his due process rights have been violated by the Government's delay in bringing this case. This prosecution was not begun until over five years from the Credit Union's closure, and during that time some documents, including the Minutes of the Board of Directors meetings, were lost.

■ To obtain dismissal of an indictment on the basis of undue delay under the due process clause, Longfellow must establish that he suffered "actual and substantial prejudice from the delay." *United States v. Windom,* 19 F.3d 1190, 1195 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Furthermore, "[d]efendant's showing of prejudice must be concrete, not speculative." *United States v. Nichols,* 937 F.2d 1257, 1261 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992); *see also Windom,* 19 F.3d at 1195.

Longfellow argues that the loss of the Board of Directors Minutes interfered with his good faith defense. However he does not make clear what he believes the minutes would show were they available. While Longfellow claims that he did discuss his transactions unofficially with a few Board members, he himself admits that he never notified the full Board of Directors that he was selling his own real estate.[3] Tr. at 474.

---

**2.** Longfellow also claims that Count II of the Indictment was barred by the Statute of Limitations, although he presents no argument on this point. Count II charges Longfellow with a violation of 18 U.S.C. § 1006 (false reporting, unauthorized loan approval, or accepting profit with intent to defraud a credit union) on the basis of his refinancing of the Kinnaird loan. Again, however, the refinancing of the loan was a separate act with its own problems of incomplete documentation and false reporting, and we will not overturn the jury's finding that the refinanc-

ing of the Kinnaird loan was sufficient to constitute a violation of 18 U.S.C. § 1006.

**3.** One member of the Board of Directors testified that he and one other Board member knew that Longfellow was selling his own property, but he did not remember how he knew, did not testify that he knew about the loans or that Longfellow had informed the Board of Directors, and seemed to only know about two of the properties sold. Tr. at 418.

Perhaps for this reason, he also does not specifically allege that the Minutes would show that the Board of Directors were aware of the transactions or that they approved them. Therefore, while we do not condone the Government's delay in this case, particularly since there seems to be no good reason for it, we do not find that Longfellow has established substantial prejudice.

For the reasons above, the decision of the district court is AFFIRMED.