**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Larry D. BACH, Defendant–Appellant.**

**No. 98–3403.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1999.

Decided April 16, 1999.

Estaban F. Sanchez, Stephen A. Kubiatowski (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Stanley N. Wasser, Feldman, Wasser, Draper & Benson, Springfield, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and FLAUM and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

The defendant pleaded guilty (with a reservation of one issue, whether the statute of limitations had run) to violating the federal mail fraud statute, 18 U.S.C. § 1341, by operating a Ponzi scheme. He was sentenced to 30 months in prison and ordered to pay $674,325.84 in restitution to his victims.

Bach pretended to sell lucrative interests in oil and gas leases—in one case promising the investor a guaranteed monthly payment of $934 for every $25,000 invested. The scheme ended in December 1992, but Bach was not indicted until June 1996. The statute of limitations for mail fraud is five years. 18 U.S.C. § 3282. Only two mailings alleged to be in furtherance of the scheme to defraud, and therefore punishable under the mail fraud statute, were made within five years before the indictment was filed. Bach contends that they were not in furtherance of the scheme to defraud. One was a check for $934, purporting to represent a portion of revenues from one of the oil and gas leases, that he mailed to one of the victims of the scheme. Another was a report, purportedly of income and expenses relating to another lease, that Bach mailed to another victim, one who believed that he had bought an interest in that lease. Enclosed along with the report was a letter advising him that because of the financial results shown in the report, the amount of operating expenses deducted from his income had been increased.

Both mailings were made in 1991, by which time, as Bach points out, his victims were smelling a rat and beginning to seek legal counsel. With the scheme unraveling, he argues, the mailings could not have been in furtherance of it. But when asked at argument what the purpose of the mailings could have been, if not to lull the recipients into thinking that maybe they would get the promised returns from their investments after all, his lawyer was at a loss. It is true that the mailings were not intended to elicit additional money from the recipients—but was that all there was to the scheme? The critical question is what the scheme was. *Schmuck v. United States*, 489 U.S. 705, 711–12, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *United States v. Sampson*, 371 U.S. 75, 80–81, 83 S.Ct. 173, 9 L.Ed.2d 136

(1962). If it was merely to obtain money from gulled investors, then it ended when Bach received the money, and once a scheme to defraud is over and done with there is nothing more to further with additional mailings. *United States v. Maze*, 414 U.S. 395, 403–05, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). But if, as is altogether more plausible, the scheme was to obtain *and retain* the payments that the investors made, then mailings designed to make the investors think that the defendant was legit, and thus to reduce the likelihood that they would complain to the SEC or take other steps designed to recoup their losses, were indeed in furtherance of the scheme to defraud. "Avoidance of detection is often a material part of a fraudulent scheme; for an illegal scheme would hardly be undertaken were there to be no profit to the plotters." *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir.1994); see also *United States v. Lane*, 474 U.S. 438, 451–53, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986); *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir.1998); *United States v. Brocksmith*, 991 F.2d 1363, 1367 (7th Cir.1993); *United States v. Perry*, 152 F.3d 900, 904–05 (8th Cir.1998). It is irrelevant that the mailings failed in their purpose; a scheme to defraud need not succeed to violate the mail fraud statute. *Schmuck v. United States, supra*, 489 U.S. at 715, 109 S.Ct. 1443; *United States v. Koen*, 982 F.2d 1101, 1109 (7th Cir. 1992); *United States v. Frey*, 42 F.3d 795, 799 (3d Cir.1994). It is all a question of what the scheme was.

■ It is true that language in some cases suggests a disposition to deem any and every effort to cover up a scheme to defraud a part of the original scheme. See, e.g., *United States v. Brocksmith, supra*, 991 F.2d at 1367–68; *United States v. Georgalis*, 631 F.2d 1199, 1204–05 (5th Cir. 1980). But to take such language literally would generate tension with the principle generally followed in dealing with statute of limitations questions that fraud, and efforts to conceal the fraud, are separate frauds, since otherwise the statute of limitations in a fraud case would not run as long as the defendant was endeavoring to conceal the fraud—even if the plaintiff had already discovered it. E.g., *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 851 (7th Cir.1996); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir.1990). It would be odd if, years after the government discovered and was investigating a mail fraud, a mailing designed to impede the investigation would not only be actionable as mail fraud and obstruction of justice in its own right, but also allow the government to prosecute the defendant for the original fraud no matter how long ago it had occurred. There is a clear analytic difference between a scheme to defraud investors and a scheme hatched and executed later to prevent the government from discovering and prosecuting the perpetrators after the original scheme ended, that is, after all the targets of the scheme were fleeced as planned. (Suppose that ten years after the fleecing, the defrauders, realizing that their victims had discovered the fraud and were complaining to prosecutors, fraudulently promised to return the money if the victims agreed not to cooperate with the government.) We need not decide whether, to the extent the second scheme succeeds in preventing the government from discovering the first within the statutory period, the doctrine of fraudulent concealment, a defense to the statute of limitations in civil cases, would be applicable despite the fact that statutes of limitations tend to be more strictly construed in criminal than in civil cases. See, e.g., *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970); *United States v. Meador*, 138 F.3d 986, 994 (5th Cir.1998). It is enough to note that in the present case the scheme was both to defraud and to retain investors' money and that the mailings charged in the indictment were indeed in furtherance of that scheme.

■ Let us move on to the sentence. Bach invites us to overrule *United States*

*v. Newman*, 144 F.3d 531 (7th Cir.1998), which holds that the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, is not subject to the Constitution's ex post facto clause (and so it may be applied retroactively) because it is not penal. See also *United States v. Nichols*, 169 F.3d 1255, 1279 (10th Cir.1999). We decline the invitation. Ours is a minority view, *United States v. Edwards*, 162 F.3d 87, 89–90 (3d Cir.1998) (collecting cases), but we think it is correct. The Act requires the court to identify the defendant's victims and to order restitution to them in the amount of their loss. In other words, definite persons are to be compensated for definite losses just as if the persons were successful tort plaintiffs. See also 18 U.S.C. § 3663(h), (j). Crimes and torts frequently overlap. In particular, most crimes that cause definite losses to ascertainable victims are also torts: the crime of theft is the tort of conversion; the crime of assault is the tort of battery—and the crime of fraud is the tort of fraud. Functionally, the Mandatory Victims Restitution Act is a tort statute, though one that casts back to a much earlier era of Anglo–American law, when criminal and tort proceedings were not clearly distinguished. See, e.g., *I. de S. & Wife v. W. de S.*, Y.B. Liber Assisarum, 22 Edw. 3, f. 99, pl. 60 (1348 or 1349); Carol S. Steiker, "Punishment and Procedure: Punishment Theory and the Criminal-Civil Procedural Divide," 85 *Geo.L.J.* 775, 782–83 (1997); Gail Heriot, "An Essay on the Civil Criminal Distinction With Special Reference to Punitive Damages," 7 *J. Contemp. Leg. Issues* 43 (1996); David J. Seipp, "The Distinction Between Crime and Tort in the Early Common Law," 76 *B.U.L.Rev.* 59, 81 (1996). The Act enables the tort victim to recover his damages in a summary proceeding ancillary to a criminal prosecution. Cf. Richard S. Frase, "Comparative Criminal Justice as a Guide to American Law Reform: How Do the French Do It, How Can We Find Out, and Why Should We Care?," 78 *Calif.L.Rev.* 542, 669–70 (1990). We do not see why this procedural innovation, a welcome streamlining of the cumbersome processes of our law, should trigger rights under the ex post facto clause. It is a detail from a defrauder's standpoint whether he is ordered to make good his victims' losses in a tort suit or in the sentencing phase of a criminal prosecution. It would be different if the order of restitution required the defendant to pay the victims' losses not to the victims but to the government for its own use and benefit; then it would be a fine, cf. *In re Towers*, 162 F.3d 952, 955 (7th Cir.1998); *United States v. Bongiorno*, 106 F.3d 1027, 1036 (1st Cir.1997), which is, of course, traditionally a criminal remedy.

Bach also complains that the judge refused to allow him to present at the sentencing hearing certain exhibits which he had been led to understand would be allowed. The judge did act abruptly, but we cannot find the harm to Bach. The exhibits were of computations of the amount of loss that Bach had inflicted on his victims. The computations were based on his argument that some of the losses were not attributable to him, such as losses resulting from solicitations to investors that were made by people working with him, notably an Indiana veterinarian who fell so completely for Bach's line that he gave up his practice, moved to New Orleans (the center of Bach's operations), and in all blessed innocence recruited additional investors for Bach's programs. Once Bach's argument for excluding the losses suffered by investors recruited by the vet, and for other exclusions, was properly rejected, his exhibits became irrelevant. And they *were* properly rejected. Relevant conduct within the meaning of the sentencing guidelines includes conduct by the defendant's agents, U.S.S.G. § 1B1.3(a)(1)(A); *United States v. Levinson*, 56 F.3d 780, 781–82 (7th Cir.1995), and the vet was Bach's agent. The other relevant conduct to which Bach objects was also properly taken into account in the sentencing; it consisted of frauds that

were mere variants of the offense of conviction and conducted at the same time.

No other issues need be discussed. The judgment is

AFFIRMED.