**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kay ANDERSON, Defendant–Appellant.**

No. 98–4146.

United States Court of Appeals,
Seventh Circuit.

Argued June 9, 1999.

Decided Aug. 19, 1999.

Rehearing Denied Nov. 5, 1999.

Timothy A. Bass (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Michael B. Nash (argued), Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and BAUER and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

Kay Anderson was convicted by a jury of three counts of bank fraud, in violation of 18 U.S.C. § 1344. She was sentenced to 24 months imprisonment and ordered to pay a $200,000 fine, along with $554,500 in restitution. For the reasons set forth below, we reverse her conviction.

## I. BACKGROUND

Mendon State Bank ("MSB") was a small, federally insured bank located in Mendon, Illinois. According to its chairman, Donald Schoch, it was primarily a farm lender. Beginning at some point in the 1980's, MSB began doing business with a real estate company named Choice 2000 ("Choice"). Although MSB had a legal lending limit of $100,000 per customer, by July of 1986, it had loaned Choice a total of over $3,000,000. Because of these extensive loans and Choice's constant overdrafting of its checking account, MSB was in considerable financial difficulty by mid–1986.

It was about this time in 1986 when the president of Choice introduced Anderson to Schoch. Anderson, a representative of AMZ Trust ("AMZ") in Houston, was to help Choice finance various real estate centers in several major cities within the United States. On July 18, 1986, MSB made four separate loans of $350,000 to Carlyle Buss, Michael Crocker, Aaron Gochman, and Charles Ragland. In addition, Schoch issued four separate money orders, each for $143,500. Three were payable to MSB, and one was payable to Choice. The three money orders made payable to MSB were sent to AMZ to purchase four zero coupon bonds of $350,000, apparently to act as security for the aforementioned loans. The $143,500 given to Choice was also wired to AMZ two days later.

Anderson opened an Asset Reserve Account at E.F. Hutton in the name of AMZ in Houston in late July of 1986. Between July 25, 1986 and August 1, 1986, three deposits totaling $470,000 were transferred into AMZ's account at E.F. Hutton, and a few weeks later, three zero coupon bonds of $350,000 each were also credited to the account. According to the government, shortly after the money was deposited, Anderson began personally drawing checks on the account and incurring debits. Throughout the month of August, MSB officials tried to collect repayment of the original loans in the form of the zero coupon bonds from Anderson. By the end of August, MSB was closed, and the FDIC was appointed receiver of the bank. In May of 1987, AMZ opened an account at Merrill Lynch. The FDIC, claiming to have an interest in the zero coupon bonds as MSB's successor in interest, made repeated (unsuccessful) attempts throughout 1987 to try to retrieve these funds from Anderson and AMZ.

Ten years after the closing of MSB, Schoch, along with his brother Eldon, the president of MSB, pleaded guilty to several improprieties that occurred while MSB was over-lending money to Choice, even though MSB had exceeded its lending limit with Choice and Choice was carrying a negative balance in its checking account. Additionally, Jerry Pardue, chairman of Choice, was convicted of embezzlement and misapplication of bank funds in con-

nection with the same activity. No charges were brought against Anderson at that time. It was not until June 19, 1997 that a federal grand jury charged Anderson with three counts of bank fraud. The indictment charged Anderson with devising a scheme to defraud and obtain monies of MSB, and later the FDIC as the bank's successor in interest. The indictment also charged that this scheme lasted from July of 1986 until at least August 7, 1987. Furthermore, the indictment charged her with taking funds of MSB and purchasing three zero coupon bonds, each with a par value of $350,000 and failing to maintain the bonds for MSB. It also charged her with taking money from MSB and using it for her own purposes. All of this conduct occurred prior to June 19, 1987, ten years before the date of the indictment. The three substantive charges of bank fraud in the indictment, however, are based on transactions in which Anderson transferred funds from AMZ's account at E.F. Hutton to its account at Merrill Lynch. The first transfer occurred on June 19, 1987, the second on July 1, 1987, and the last on or about August 6, 1987.

Anderson's jury trial began on June 22, 1998. On June 30, 1998, the jury returned a guilty verdict on all three counts. Anderson was sentenced to 24 months imprisonment for counts one and two, to run concurrently. The sentence on count three was suspended. This appeal followed.

## II. DISCUSSION

■ Anderson raises several issues on this appeal; however, we need only to address her statute of limitations argument to dispose of the case. We review *de novo* a trial court's decision about whether the statute of limitations has run. *Garrison v. Burke*, 165 F.3d 565, 569 (7th Cir. 1999).

Anderson was convicted of three counts of bank fraud, in violation of 18 U.S.C. § 1344. That section states:

whoever knowingly executes, or attempts to execute a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined not more than $1,000,000 or imprisoned no more than 30 years, or both.

*Id.* The statute of limitations for bringing an action for bank fraud is ten years. *See* 18 U.S.C. § 3293. Statutes of limitations are imposed "to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie v. United States*, 397 U.S. 112, 114, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). The United States Supreme Court has stated on more than one occasion that criminal statutes of limitations are to be "liberally interpreted in favor of repose" so that prompt investigation of criminal activity is encouraged. *Id.* at 115, 90 S.Ct. 858 (quoting *United States v. Scharton*, 285 U.S. 518, 522, 52 S.Ct. 416, 76 L.Ed. 917 (1932)).

■ The bank fraud statute was enacted in October of 1984 and was modeled after the federal mail and wire fraud statutes. Steven M. Biskupic, *Fine Tuning the Bank Fraud Statute: A Prosecutor's Perspective*, 82 Marq. L.Rev. 381, 382 (Winter 1999). Just as mail fraud is punishable once the material is placed in the mail, *see United States v. Barger*, 178 F.3d 844, 847 (7th Cir.1999), the crime of bank fraud is complete when the defendant places the bank at a risk of financial loss, and not necessarily when the loss itself occurs. *Cf. United States v. Longfellow*, 43 F.3d 318, 324 (7th Cir.1994) (citing *United States v. Hord*, 6 F.3d 276, 282 (5th Cir.1993) for the proposition that "risk of loss, not just loss itself, supports convic-

tion"). The phrase "scheme to defraud" is to be construed liberally, only to be limited by the criminal's creativity. *United States v. Yoon*, 128 F.3d 515, 522 (7th Cir.1997) (quoting *United States v. Norton*, 108 F.3d 133, 135 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 66, 139 L.Ed.2d 28 (1997)). Thus, a scheme will include all conduct designed to deceive in order to obtain something of value. *Yoon*, 128 F.3d at 522.

Anderson claims that any fraud that occurred did so in 1986 when she originally obtained the monies from MSB in relation to the loans that MSB made to Choice, and not when she transferred funds from AMZ's account at E.F. Hutton to its account at Merrill Lynch (which she claims only occurred because her broker had moved from E.F. Hutton to Merrill Lynch). Therefore, she claims that any fraudulent scheme must have been executed before June 19, 1987, and the statute of limitations had run prior to her indictment. In rejecting this argument, the district court relied heavily on our decision in *Longfellow, supra*, and the Second Circuit's decision in *United States v. Duncan*, 42 F.3d 97 (2nd Cir.1994). Based on those decisions, the district court determined that the conduct charged in counts 1–3 of the indictment (the transferring of the funds from AMZ's E.F. Hutton account to its Merrill Lynch account) constituted a continuation of Anderson's scheme to defraud. Since the charged conduct occurred after June 19, 1987, the district court ruled that the statute of limitations was not violated. While both *Longfellow* and *Duncan* are good reference points in determining what conduct amounts to execution of a fraudulent scheme, the district court's heavy reliance on them is misplaced; both cases involve conduct that constitutes execution of bank fraud schemes that are radically different from any conduct involved here.

■ In *Longfellow*, we ruled that the bank fraud statute is meant to punish each "execution" of the scheme to defraud, and not each act in furtherance of the scheme to defraud. *Longfellow*, 43 F.3d at 323 (quoting *United States v. Molinaro*, 11 F.3d 853, 859 (9th Cir.1993)). Thus, it is entirely possible to have more than one execution of the same criminal scheme. Ultimately, the decision of whether an action is an execution of the criminal scheme will be fact intensive; there are several factors to consider, including, but not limited to, the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved. *Longfellow*, 43 F.3d at 323. *Longfellow* involved a scheme in which the defendant, as President and CEO of a Credit Union, made a series of loans to individuals so that they could purchase land owned by the defendant. *Id.* at 319. The loans were never properly or fully recorded, and the land titles were never transferred to the Credit Union as collateral for the loans. *Id.* It was undisputed in *Longfellow* that all the original loans occurred more than five years before Longfellow was indicted.[1] However, Longfellow refinanced one of those loans within the statute of limitations period, and the government charged that the refinancing of that loan constituted an execution of his scheme to defraud, bringing the entire scheme within the statute of limitations. Longfellow argued that the refinancing of the loan was not an execution, but rather a continuation of the prior transaction and execution, which had been barred by the statute of limitations. *Id.* at 322. We ruled that the refinancing of the original loan constituted a separate execution of the scheme because it created a new, independent risk for the Credit Union. *Id.* at 324. Even though Longfellow received no extra cash from the refinancing of the loan, he deprived the Credit

---

1. At the time *Longfellow* was decided, the crime of bank fraud had a 5 year statute of limitations.

Union of the opportunity of being reimbursed through foreclosure of the original loan. *Id.* Furthermore, we held that even though the two loans were not contemplated together, the refinancing was entered into in order to "rescue" the original loan. *Id.* at 325. However, the basis of the decision was that the refinancing of the loan created a *new risk* for the Credit Union (and arguably a renewed gain for Longfellow). *Id.*

The other case on which the district court relied, *Duncan*, involved a challenge of the Ex Post Facto clause because Duncan was charged with conduct that he thought occurred before the passage of the bank fraud statute. *Duncan*, 42 F.3d at 103–04. That case involved a scheme wherein the defendant, and others, who were directors of Security Savings & Loan Association ("SSLA"), conspired to purchased some real estate with the intention of leasing it to SSLA, but in such a way that the other directors of SSLA had no idea that the defendants had an interest in the property. *Id.* at 99. However, rather than leasing the properties, the defendants sold them outright to SSLA for a hefty profit. *Id.* at 100. It was undisputed that the properties were purchased before the bank fraud statute was enacted, but they were sold afterwards. Duncan argued that the real fraud occurred when the conspirators usurped the corporate opportunity from SSLA and personally bought the properties, and that the sale of the properties was not a component of the bank fraud. *Id.* at 104. The court found differently. The court ruled that the central purpose of the charged scheme was to secretly purchase *and then sell the properties* to the bank at a premium. *Id.* (emphasis supplied). The court also held that the government presented ample evidence to show that the defendants' plan from the outset was to purchase the properties and make a profit at SSLA's expense. *Id.* Thus the court was not prepared to separate the initial deception of the bank from

"the central purpose of the fraudulent venture," which was to eventually turn a profit from the scheme. *Id.* Since the sale of the properties occurred within the statute of limitations, the execution of the entire bank fraud scheme fell within the statute of limitations. *Id.* at 105.

Recently, although in the context of mail fraud, we held that in order to determine whether the statute of limitations has run, the central question to decide is what the scheme was. *United States v. Bach*, 172 F.3d 520, 521 (7th Cir.1999). In *Bach*, the defendant made several mailings to fraudulently induce investors to send him money more than 5 years prior to his indictment.[2] *Id.* Then, as his scheme began to fall apart, he made two more mailings to assure his "clients" that their investments were safe. *Id.* These mailings were made within 5 years of his indictment. *Id.* He argued that since the mailings were made after his scheme had unraveled and the victims were already seeking legal counsel, then the mailings could not have been made in furtherance of his original scheme, which was barred by the statute of limitations. *Id.* However, we held that the scheme was not only to defraud the investors, but to defraud *and retain* the investors' money. *Id.* at 522. Thus, in upholding Bach's conviction, we held that the mailings which did occur within the statute of limitations were in furtherance of his original scheme to defraud. *Id.*

■ This case, however, is significantly different from these examples. Here, we do not have the same kind of misrepresentation as in *Longfellow*. The refinancing of the loan in that case put the Credit Union at a separate, distinguishable financial risk from the risk it already undertook in making the original loan. Thus, it was a separate execution. The conduct charging Anderson with bank fraud did not put MSB or the FDIC at any *additional* risk. Similarly, in *Duncan*, the purpose of the scheme could not have been completed

---

**2.** The statute of limitations for mail fraud is    five years.

until the defendants sold the parcels of land to SSLA. Again, this transaction put SSLA at a separate risk. That is not the case here, either. Any scheme Anderson may have conceived was completed upon receipt of the funds. The mere act of transferring money from one bank account to another was not part of the original scheme to defraud, nor did it create a new financial risk. Lastly, in *Bach*, the defendant actually made fraudulent mailings (the essence of mail fraud) to his victims assuring the security of their investments. Again, Anderson took no step remotely similar to this to complete her scheme when she transferred the funds from E.F. Hutton to Merrill Lynch.

When Anderson received the money to buy the zero coupon bonds, the fraud was complete. The conduct charged in the indictment did not place the bank at any separate, distinguishable risk of financial loss. The mere act of her transferring the money from the AMZ account at E.F. Hutton to the account at Merrill Lynch created no more of a risk than if she had simply kept the money in the E.F. Hutton account or used the money to buy groceries. The execution of the fraudulent scheme is complete upon the movement of money, funds, or other assets from the financial institution. *United States v. Christo*, 129 F.3d 578, 580 (11th Cir.1997) (citing *United States v. Mancuso*, 42 F.3d 836, 847 (4th Cir.1994)). Any conduct charged in the indictment which may have placed the bank at a financial risk occurred prior to June 19, 1987. Once Anderson had control of the money, the scheme ended. Otherwise, under the government's theory, the scheme could continue as long as Anderson maintained control of the money, thus defeating the purpose of criminal statutes of limitations. So long as she did not take part in any additional conduct that would have placed the bank at a separate, distinguishable risk, the statute of limitations continues to run. *Cf. United States v. Meador*, 138 F.3d 986, 994 (5th Cir.1998) (recognizing risks in construing

statutes of limitations in favor of repose). The conduct on which the government hangs its hat to support the conviction is some mailings that Anderson made to the FDIC, within the statute of limitations, to thwart its attempts to collect the money. However, this conduct is not charged in the indictment. There is no conduct charged in the indictment which occurred after June 19, 1987 that constitutes the execution of a bank fraud scheme. The conduct may constitute some other offense, but as the indictment stands, the mere act of transferring the funds is not bank fraud. Spending the proceeds of a criminal venture is not part of a scheme to defraud. Since any conduct which was part of Anderson's scheme to defraud MSB occurred more than 10 years before she was charged with the crime, the statute of limitations had run, and Anderson's conviction is

REVERSED.